KELLUM, Judge.
Matthew Reeves appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P., in which he attacked his capital-murder conviction and sentence of death.
In 1998, Reeves was convicted of murder made capital because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 10-2, the jury recommended that Reeves be sentenced to death for his capital-murder conviction. The trial court followed the jury’s recommendation and sentenced Reeves to death. This Court affirmed Reeves’s conviction and sentence on appeal. Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000). The Alabama Supreme Court denied certiorari review, and this Court issued a certificate of judgment on June 8, 2001. The United States Supreme Court subsequently denied certiorari review on November 13, 2001. Reeves v. Alabama, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001).
In our opinion affirming Reeves’s conviction and sentence, this Court set out the facts of the crime as follows:
“The State’s evidence tended to show the following. On November 27, 1996, *719 the appellant (who was 18 years old at the time) and his younger brother, Julius, visited Brenda Suttles and Suttles’s 15-year-old cousin, Emanuel, at Sut-tles’s house on Lavender. Street in Selma. There, according to Suttles, everyone agreed to go out ‘looking for some robberies.’ (R. 684.) Shortly after noon that day, the foursome left Suttles’s house on foot and walked to a nearby McDonald’s restaurant, where they saw Jason Powell driving by in his car. The appellant’s brother, Julius, flagged Powell down, and Powell agreed to give the group a ride.
“Brenda Suttles and Emanuel Suttles testified that after the foursome got into Powell’s car, Julius Reeves suggested that they go to White Hall, a town in neighboring Lowndes County, to rob a drug dealer. According to Brenda Sut-tles, everyone in the car agreed to the plan. (Powell, who also testified at trial, denied hearing the discussion about a robbery.) Before leaving Selma, the group stopped at an apartment on Broad Street. Julius Reeves went inside the apartment and returned to the car a short time later carrying a shotgun, which he handed to the appellant. With Powell driving, the group then headed for White Hall.
“Before they reached White Hall, however, Powell’s car broke down on a dirt road off Highway 80. Shortly thereafter, a passing motorist, Duane Smith, stopped and told the group that he was in a hurry to meet some friends to go hunting, but that he would return around sunset and would take them to get help then. For the next couple of hours, the group sat in Powell’s car and listened to music, until another passing motorist, Willie Johnson, stopped in his pickup truck and offered to tow Powell’s car to Selma. Using some chains that he kept in his pickup truck, Johnson hooked Powell’s car to the back of his truck. With Julius Reeves riding in the truck with him and the others in Powell’s car, Johnson towed the car to the Selma residence where the appellant and Julius lived with their mother.
“When they arrived at the Reeveses’ house, Julius ReeVes got out of Johnson’s truck and told the others that Johnson wanted $25 for towing them. However, no one had any money to pay Johnson. Julius Reeves then offered to give Johnson a ring as payment if Johnson would drive him to his girlfriend’s house to get the ring. Johnson agreed and he unhooked Powell’s car from his truck. According to Jason Powell and Emanuel Suttles, Julius Reeves at this point told the others that Johnson was going to be their robbery victim. While Jason Powell and Emanuel Suttles stayed behind with Powell’s car in front of the Reeveses’ house, Julius Reeves got back in the cab of the truck with Johnson, and Brenda Suttles climbed into the rear bed of the truck. Testimony indicated that when Johnson started the truck, the appellant jumped into the rear bed of the truck with the shotgun, hiding the weapon behind his leg as he did so.
“When they arrived at Julius’s girlfriend’s house in Johnson’s truck, Julius went inside and retrieved the ring he had promised to give Johnson as payment. According to Brenda Suttles, when Julius came out of the house, he walked to the rear of Johnson’s truck and told her and the appellant that he was not going to let Johnson keep the ring. After Julius got back in the cab of the truck, Johnson drove everyone back to the Reeveses’ house.
“Jason Powell and Emanuel Suttles, who had remained at the house with Powell’s car, testified that sometime *720 around 7:00 p.m., they saw Johnson’s truck drive by the house and turn into an alley—known as Crockett’s Alley— behind the house. According to Brenda Suttles, who was in the rear, bed of the truck with the appellant, just as the truck came to a stop in the alley, she heard a loud ‘pow’ sound. (R. 704.) Suttles. testified that when she looked up, the appellant was withdrawing the barrel of the shotgun from the open rear window of the truck’s cab. Johnson had been shot in the neck and was slumped over in the driver’s seat. Suttles testified that Julius Reeves jumped out of the truck’s cab and asked the appellant what he had done, and that the appellant then told Julius and Suttles to go through Johnson’s pockets to ‘get his money.’ (R. 704.) Suttles stated that Julius then pulled Johnson out of the truck and went through his pockets, giving the money he found in the pockets to the appellant. After Julius had gone through Johnson’s pockets, Suttles helped him put Johnson back in the truck’s cab, According to Suttles, Johnson was bleeding heavily and making ‘gagging’ noises. (R. 721.)
“Jason Powell and Emanuel Suttles testified that they heard the gunshot after Johnson’s truck pulled into Crockett’s Alley and that'a short time later they saw the appellant, Julius Reeves, and Brenda Suttles run out of the alley and into the Reeveses’ house. The appellant was carrying a shotgun, they said. They followed- the appellant, Julius Reeves, and Brenda Suttles into the Reeveses’ house and saw the appellant place the shotgun under a bed in his bedroom. The appellant told Julius and Brenda Suttles to change out of their bloodstained clothes and shoes, and he took the clothes and shoes and stuffed them under, a dresser in his bedroom. According to Emanuel Suttles, as the appellant, Julius, and Brenda changed their clothes, they were ‘jumping and hollering’ and celebrating about ‘all the stuff [they] got’ from Johnson. (R. 842.) Jason PoWell testified -that he heard the appellant say, T made the money.’ (R. 786.)
“After changing their clothes, the appellant, Julius Reeves, and Brenda Sut-tles ran to Suttles’s house. On the way, the appellant stopped to talk to his girlfriend, telling her that if she should be questioned by the police, to tell them that he had been with her all day. At Suttles’s house, the appellant divided the money taken from Johnson—approximately $360—among himself, Julius Reeves, and Brenda Suttles. Testimony indicated that throughout the evening, the appellant continued to brag about having shot Johnson.- Several witnesses who were present'at Suttles’s house that evening testified that they- saw the appellant dancing, ‘throwing up’ gang signs, and pretending to pump-a shotgun. Brenda Suttles testified that as the appellant danced, he would jerk his body around in a manner ‘mockfing] the way that Willie Johnson had died.’ (R. 713.) The appellant was also heard to say that the shooting would earn him a ‘teardrop,’ a gang tattoo acquired for killing someone. (R. 720.)
“Yolanda Blevins, who was present during the post-shooting ‘celebration’ at Suttles’s house, testified that the appellant called her into the kitchen and told her that he had shot a man in a truck after catching a ride with him. Blevins noticed that there was what appeared to be dried blood on the appellant’s hands. LaTosha Rodgers, who was also present at Suttles’s house, testified.that the appellant told her that he had ‘just shot somebody’ in the alley. (R. 924.)
*721 “At around 2:00 a.m. on November 28, .1996 (approximately seven hours after the shooting), Selma police received a report of a suspicious vehicle parked in Crockett’s Alley. When police officers investigated, they found Johnson’s body slumped across the seat of his pickup truck. There was a pool of blood on the ground on the driver’s side of the truck. Several coins and a diamond ring were on the ground near the track. On the floorboard of the truck, police found wadding from a shotgun shell. The pockets of Johnson’s pants had been turned inside out and were empty. Testimony at trial indicated that Johnson was a longtime employee of the Selma Housing Authority and that on the afternoon of November 27, 1996, he had cashed his paycheck, which had been in the amount of $500.
“At the shooting scene on the morning of November 28, police also discovered a trail of blood leading from Johnson’s truck to the Reeveses’ house. Randy Tucker, a canine-patrol officer with the Selma Police Department, testified that his dog tracked the blood trail from the pool of blood next to Johnson’s truck, down Crockett’s Alley, through the yard at 2126 Selma Avenue (the residence next to the alley), and ultimately to the front steps of the Reeveses’ house at 2128 Selma Avenue.
“Pat Grindle, the detective in charge of investigating Johnson’s murder, went to the Reeveses’ house after learning that the blood trail led there. Det. Grindle testified that he obtained the consent of the appellant’s mother, Mar-zetta Reeves, to search the house. In a bedroom shared by the appellant and Julius, Det. Grindle found bloodstained clothes and bloodstained shoes; under a bed in this bedroom, Det. Grindle found a shotgun. In searching the kitchen, Det. Grindle found a pair of bloodstained pants. After making these discoveries, Det. Grindle questioned ■. Marzetta Reeves and several other persons who were in the house at that time. Det. Grindle stated that he learned that the bloodstained clothes and shoes belonged to Julius Reeves, Brenda Suttles, and the appellant. Det, Grindle then went to Suttles’s house in an attempt to locate the three. At Suttles’s house, Det. Grin-dle found the appellant lying on a couch in a front room'. The appellant was placed under arrest, and the officers seized a balled-up bloodstained jacket he was using as a headrest on the couch'. Det. Grindle later returned to the Reeveses’ residence, where he seized a 12 gauge shotgun shell from a garbage can in the bathroom.
“An. autopsy revealed that Johnson had died irom a shotgun wound to his neck that severed the carotid artery, causing him to bleed to death over a period of several minutes. Bloodstain patterns in Johnson’s truck indicated that he was sitting upright in the driver’s seat, facing forward, when he was shot from behind, through the open rear window. The bloodstain patterns also indicated that the driver’s side door had been opened and closed shortly after Johnson was shot.
“Testimony indicated that the appellant’s fingerprints were found on the shotgun that Det. Grindle had seized from under the bed in the appellant’s bedroom. Brenda Suttles’s and Julius Reeves’s fingerprints were found on a fender of Johnson’s truck. Joseph Sa-loom, a firearms expert with the Alabama Department of Forensic Sciences, testified that the shotgun shell seized from the bathroom at the Reeveses’ residence was of the type commonly fired from the shotgun, seized from the appellant’s bedroom. Sáloom stated that the *722 shotgun-shell wadding found on the floorboard of Johnson’s truck was of the type commonly found in the kind of shotgun shell seized from the bathroom at the Reeveses’ residence.”
Reeves, 807 So.2d at 24-26.[1]
Reeves timely filed his Rule 32 petition on October 30, 2002.[2] He filed an amended petition on February 26, 2003, and a second amended petition on August 31, 2006. The circuit court, Reeves, and the State treated the second amended petition as superseding the previous petitions, and we do the same.[3] See, e.g., Smith v. State, 160 So.3d 40, 47-49 (Ala.Crim.App.2010). In his petition, Reeves raised claims of ineffective assistance of both trial and appellate counsel, of trial court error, and of juror misconduct. Reeves also alleged that he was intellectually disabled and that, therefore, his death sentence was unconstitutional under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[4] The State filed an answer to the petition on October 28, 2006. The circuit court conducted an evidentiary hearing on the petition on November 28-29, 2006. At the hearing, Reeves called two witnesses to testify, and the State called one witness. Reeves did not call his trial and appellate attorneys to testify. The parties also submitted numerous documentary exhibits. On May 7, 2008, the State filed a proposed order denying Reeves’s petition. On September 9, 2008, Reeves filed a written objection to the State’s proposed order and a post-hearing brief. On October 26, 2009, the circuit court issued an order denying Reeves’s petition.
The record indicates that the parties were not notified of the circuit court’s ruling until January 2013. Reeves then filed another Rule 32 petition pursuant to Rule. 32.1(f), Ala. R.Crim. P., requesting an out-of-time appeal from the circuit court’s October 26, 2009, order denying his first petition. The circuit court ultimately granted Reeves an out-of-time-appeal on May 30, 2014. This appeal followed.
In a Rule 32 proceeding, both the burden of pleading and the burden of proof are on the petitioner. See Rule 32.3, Ala. R.Crim. P. (“The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”). “On direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a *723 Rule 32 proceeding attacking a death sentence.” Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008). Therefore, “[t]he general rules of preservation apply to Rule 32 proceedings,” Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App.2003), and this Court “will not review issues not listed and argued in brief.” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). Additionally, “[i]t is well settled that ‘the procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.’ ” Nicks v. State, 783 So.2d 895, 901 (Ala.Crim.App.1999) (quoting State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993)).
The general rule is that “when the facts are undisputed [or] an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). On the other hand, “where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’ ” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)). Even when the disputed facts arise from a combination of oral testimony and documentary evidence, we review the circuit court’s findings for an abuse of discretion and afford those findings a presumption of correctness. See Parker Towing Co. v. Triangle Aggregates, Inc., 143 So.3d 159, 166 (Ala.2013) (noting that the ore tenus rule “applies to ‘disputed issues of fact,’ whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence” (citation omitted)). Moreover, with limited exceptions not applicable here, this Court may affirm a circuit court’s judgment on a Rule 32 petition if it is correct for any reason. See Bryant v. State, 181 So.3d 1087 (Ala.Crim.App.2011); Moody v. State, 95 So.3d 827, 833 (Ala.Crim.App.2011); and McNabb v. State, 991 So.2d 313, 333 (Ala.Crim.App.2007), and the cases cited therein.
With these principles in mind, we address each of the issues Reeves raises on appeal.
I.
Reeves contends that the circuit court erroneously adopted verbatim that portion of the State’s proposed order addressing his claim of intellectual disability. Reeves concedes that the circuit court did not adopt the State’s proposed order in its entirety. Nonetheless, he argues that the circuit court’s verbatim adoption of the language from the State’s proposed order as to even one claim indicates “an absence of careful and independent judicial consideration” of that claim and requires reversal. (Reeves’s brief, p. 36.) Reeves maintains that the circuit court’s findings on his intellectual-disability claim are not that of the circuit court itself, but solely of the State and, therefore, cannot stand. We disagree.
“Alabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.” McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003). “While the practice of adopting the state’s proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.” Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). “[T]he general rule is that, *724 where a trial court does in fact adopt the proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court.” Ex parte Ingram, 51 So.3d 1119, 1122 (Ala. 2010). Only “when the record before this Court clearly establishes that the order signed by the trial court denying postcon-viction relief is not the product of the trial court’s independent judgment” will the circuit court’s adoption of the State’s proposed order be held erroneous. Ex parte Jenkins, 105 So.3d 1250, 1260 (Ala.2012).
For example, in Ex parte Ingram, supra, the circuit court adopted verbatim the State’s proposed order summarily dismissing Robert Shawn Ingram’s Rule 32 petition. In the order, the court stated that it had considered “ ‘the events within the personal knowledge of the Court’” and that it'had “ ‘presided over Ingram’s'capital murder trial and personally observed the performance of both lawyers throughout Ingram’s trial and sentencing.’” Ex parte Ingram, 51 So.3d at 1123 (citation and’ emphasis omitted). However, : the judge who summarily dismissed the petition had not, in fact, presided over Ingram’s trial and had no personal knowledge of the trial. The Alabama Supreme Court described these errors in the court’s adopted order as “the most material and obvious of errors,” 51 So.3d at 1123, and “patently erroneous,” 51 So.3d at 1125, and concluded that the errors “underminefd] any confidence that the trial court’s findings of fact and conclusions of law [we]re the product of the trial judge’s independent judgment.” 51 So.2d at 1125.
In Ex parte Scott, [Ms. 1091275, March 18, 2011] — So.3d - (Ala.2011), the circuit court adopted verbatim as its order the State’s answer to Willie Earl Scott’s Rule 32 petition. The Alabama Supreme Court stated:
“[A]n answer, by its very nature, is adversarial and sets forth one party’s position in the litigation, It makes no claim of being an impartial consideration of the facts and law; rather it is a work of advocacy .that exhorts one party’s perception of the law as it pertains to the relevant facts.”
Ex parte Scott, — So.3d at -. The Court then held that “[t]he trial court’s verbatim adoption of the State’s answer to Scott’s Rule 32 petition as its order, by its nature, violates this Court’s holding in Ex parte Ingram ” that the findings and conclusions in a court’s order must be those of the court itself. Ex parte Scott, — So.3d at -.
Unlike Ex parte Ingram and Ex parte Scott, the record in this case does not clearly establish that the portion of the circuit court’s order denying Reeves’s intellectual-disability claim was not the product of the court’s own independent judgment. The circuit court’s order contains no patently erroneous statements as was the case in Ex parte Ingram,[5] and the circuit court here adopted a portion of the State’s proposed order, not a portion of the State’s answer, as was the case in Ex parte Scott. After thoroughly reviewing the record, we conclude that the circuit court’s findings on Reeves’s intellectual-disability claim were its own and were not merely an unexamined adoption of the proposed order submitted by the Staté. See, e.g., Ex parte Jenkins, 105 So.3d at 1260; Van Pelt v. State, 202 So.3d 707 (Ala.Crim.App.2015); Spencer v. State, 201 So.3d 573 (Ala.Crim.App.2015); and Mashburn v. State, 148 So.3d 1094 (Ala.Crim.App.2013). Therefore, we find no error on the part of the circuit court in adopting verbatim that *725 portion of the State’s proposed order addressing Reeves’s intellectual-disability claim.
II.
■ Reeves also contends that the circuit court erred in denying his claim of intellectual disability under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). He argues that he suffers from significantly subaverage intellectual functioning and significant deficits in multiple areas of adaptive functioning, all of which manifested before he reached the age of 18, and that the circuit court’s findings and conclusions to the contrary were erroneous’. Therefore, Reeves concludes, his death sentence is unconstitutional, and the circuit court erred in not granting him relief on this claim in his petition. We disagree.
“ ‘ “In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.” ’ Byrd [v. State], 78 So.3d [445,] 450 [ (Ala.Crim.App.2009) ] (quoting Smith [v. State, 213 So.3d [239, 252 (Ala. 2007) ]). ‘The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.’ Byrd, 78 So.3d at 450 (citations and quotations omitted). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, ‘ “which [have] the opportunity to personally observe the witnesses and assess their credibility.’” Smith, 213 So.3d at 253 (quoting Smith v. State, 213 So.3d. 226, 239 (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).
“ ‘This court reviews the circuit court’s findings of fact for an abuse of discretion.’ Byrd, 78 So.3d at 450 (citing Snowden v. State,. 968 So.2d 1004, 1012 (Ala.Crim.App.2006)). ‘ ‘ “ ‘A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.’ ” ”” Byrd, 78 So.3d at 450-51 (quoting Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005), quoting in turn State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996), quoting in turn Dowdy v, Gilbert Eng’g Co., 372 So.2d 11, 12 (Ala.1979), quoting in turn Premium Serv. Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir.1975)).”
Carroll v. State, 215 So.3d 1135, 1148 (Ala.Crim.App.2015).
In Atkins, the United States Supreme Court held that the execution of intellectually disabled persons violates the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution. The Court in Atkins did not establish a national standard for determining whether a person is intellectually disabled for purposes of the Eighth Amendment, but left to the states “ ‘the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ ” Atkins, 536 U.S. at 317 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). The Court did note, however, the following clinical definitions of intellectual disability:
“The American Association on Mental Retardation (AAMR)[6] defines mental *726 retardation as follows: ‘Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.’ Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
“The American Psychiatric Association’s definition is similar: ‘The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.’ Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). ‘Mild’ mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id, at 42-43.”
536 U.S. at 308 n. 3. The Court also noted that an intelligence quotient (“IQ”) between 70 and 75 “is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.” Id. at 309 n. 5.
Subsequently, in Hall v. Florida, 572 U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), the United States Supreme Court recognized that IQ test scores, alone, are not determinative of intellectual disability or even of the intellectual-functioning prong of intellectual disability because IQ testing has a margin of error or standard error of measurement (“SEM”). The Court held unconstitutional Florida’s strict IQ score cutoff of 70 for establishing intellectual disability. The Florida Supreme Court had held that a person who attained an IQ score above 70 was, as a matter of law, not intellectually disabled and was prohibited from presenting any further evidence to support a claim of intellectual disability. See Hall v. State, 109 So.3d 704 (Fla.2012), citing Cherry v. State, 959 So.2d 702, 712-13 (Fla.2007). In holding this strict IQ score cutoff of 70 unconstitutional, the United States Supreme Court recognized that IQ test scores are “imprecise” and have a “ ‘standard error of measurement’ ” that “is a statistical fact [and] a reflection of the inherent imprecision of the test itself.” Hall, 572 U.S. at -, 134 S.Ct. at 1995. The Court noted that .the SEM, which the Court recognized to be plus or minus five points on standard IQ tests, “reflects the reality that an individual’s intellectual functioning cannot be reduced to a single numerical score,” Hall, 572 U.S. at -, 134 S.Ct. at 1996, and that, therefore, IQ test scores are not “final and conclusive evidence of a defendant’s intellectual capacity,” and “should be read not as a single fixed number but as a range.” Hall, 572 U.S. at -, 134 S.Ct. at 1995.
*727 Because of the inherent imprecision in IQ testing, the Court noted, “[flor professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual’s IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning.” Hall, 572 U.S. at -, 134 S.Ct. at 1996. In other words, “an individual with an IQ test score ‘between 70 and 75 or lower,’ Atkins, [536 U.S.] at 309 n. 5, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.” 572 U.S. at -, 134 S.Ct. at 2000. The Court concluded that
“when a defendant’s IQ test score falls within the test’s acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.
“It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment. See DSM-5, at 37 (‘[A] person with an IQ score above 70 may have such severe adaptive behavior problems ..: that the person’s actual functioning is comparable to that of individuals with a lower IQ score.’).”
572 U.S. at -, 134 S.Ct. at 2001.[7] See also Brumfield v. Cain, 576 U.S. -, —, 135 S.Ct. 2269, 2278, 192 L.Ed.2d 356 (2015) (holding that the petitioner was entitled to a hearing on his intellectual-disability claim because, when accounting for the SEM, his IQ score of 75 was “squarely in the range of potential intellectual disability”).
Shortly after Atkins was first released, the Alabama Supreme Court adopted “the broadest definition” of intellectual disability based on “[t]hose' states with statutes prohibiting the execution of’ intellectually disabled defendants. Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002). The Court explained:
“Those states with statutes prohibiting the execution of a mentally retarded defendant require that - a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
Ex parte Perkins, 851 So.2d at 456.
Later, in Smith v. State, 213 So.3d 239 (Ala.2007), the Alabama Supreme Court reiterated and clarified Alabama’s definition of intellectual disability:
“In Ex parte Perkins, [851 So.2d 453 (Ala.2002),] we concluded that the ‘broadest’ definition of mental retardation consists of the following three factors: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant’s developmental period *728 (i.e., before the defendant reached age 18). 851 So.2d at 456. All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim. Implicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18. This conclusion finds support in examining the facts we found relevant in Ex parte Perkins and Ex parte Smith [, 213 So.3d 214 (Ala.2003),] and finds further support in the Atkins decision itself, in which the United States Supreme Court noted: ‘The American Association on Mental Retardation (AAMR) defines mental retardation as follows: “Mental retardation refers to substantial limitations in present functioning.” ’ 536 U.S. at 308 n. 3 (second emphasis added). Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit sub-average intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.
“The definition set' forth in Ex parte Perkins is in accordance with the definitions set forth in the statutes of other states and with recognized clinical definitions, including those found in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994). The Manual of Mental Disorders lists four degrees of mental retardation: mild, moderate, severe, and profound. Id at 40-41. All four degrees of mental retardation require that all three prongs of the Ex parte Perkins test be satisfied before an individual can be diagnosed as mentally retarded; thus, if the defendant proves that he or she suffers any degree of mental retardation, the defendant is ineligible for the death penalty. However, a classification of ‘borderline intellectual functioning’ describes an intelligence level that is higher than mental retardation, id. at 45 and, thus, does not render a person ineligible for the death penalty.”
213 So.3d at 248-49 (emphasis added).
The Alabama Supreme Court’s definition of intellectual disability adopted in Ex parte Perkins comports with both Atkins and Hall, supra. Although the definition references an IQ score of 70, that referenced score is not a strict cutoff for intellectual disability, and Alabama does not preclude a court’s consideration of the SEM when considering a person’s IQ score. See Lane v. State, [Ms. CR-10-1343, April 29, 2016] — So.3d - (Ala.Crim.App.2016) (opinion after remand by the United States Supreme Court). Nor does Alabama preclude a person-from presenting additional evidence regarding intellectual disability merely because that person attained an IQ score above 70. Indeed, this Court, subsequent to Ex parte Perkins, twice recognized that a person may be intellectually disabled even- if that person attains an IQ score above 70 on a test, see Jackson v. State, 963 So.2d 150 (Ala.Crim.App.2006) (holding that Rule 32 petitioner was intellectually disabled even though he achieved a score above 70 on one of four IQ .tests h,e had taken), and Tarver v. State, 940 So.2d 312, 318 (Ala.Crim.App.2004) (remanding for a hearing to determine intellectual disability where record indicated that Rule 32 petitioner had IQ scores’of 76, 72, and 61), and we three times recognized the; SEM in evaluating an Atkins claim. See Smith v. State, 112 So.3d 1108 (Ala.Crim.App.2012); Byrd v. State, 78 So.3d 445 (Ala.Crim.App.2009); *729 and Brown v. State, 982 So.2d 565 (Ala.Crim.App.2006). Additionally, in Ex parte Smith, 213 So.3d 214, 225 (Ala.2003), the Alabama Supreme Court noted that an IQ score of 72 “seriously undermines any conclusion that [a person] suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions,” but it did not hold that an IQ score of 72 precludes a finding that a person suffers from significantly subaver-age intellectual functioning or precludes a finding of intellectual disability. Both this Court’s and the Alabama Supreme Court’s post-Atkins opinions make clear that a court should look at all relevant evidence in assessing an intellectual-disability claim and that no one piece of evidence, such as an IQ test score, is conclusive as to intellectual disability,[8]
At the evidentiary hearing, Reeves introduced a plethora of records from his childhood and adolescent years, including school records, medical records, mental-health records, juvenile-court records, Department of Youth Services records, and county-health-department records. Those records reflect that Reeves was habitually truant and engaged in defiant and aggressive behavior in school, that he had a lengthy criminal history, and that he had been committed to the Department of Youth Services. The records further reflect that Reeves began mental-health treatment in 1986, when he was.8 years old. Reeves was initially diagnosed with attention deficit disorder with hyperactivity and was later also diagnosed with conduct-disorder. Nonetheless, .Reeves was described as “extremely goal-directed.” (C. 1556.) When Reeves began treatment, his intelligence level was “estimated to be low average range.” (C. 1515.) Two years later, “it [wa]s. estimated that his intelligence is somewhat below average, but not within the [intellectual-disability] range.” (C. 1543.)
The records -further reflect that Reeves had to repeat the first, third, and fourth grades and that he was “socially” promoted to the seventh grade when he was 14 years old based only on his “level of maturity.” (C. 1688.) However, the records indicate that although Reeves failed the first grade, when he repeated that grade, he. got A’s and B’s and made the -,honor roll: (C. 1513.) .Additionally, Reeves’s mother reported that when he was 11 years old, Reeves was tested for placement into special-education classes, but that he “did not qualify.” (C. 1543.) Reeves was later placed in special-education classes for emotional conflict. When he was 14 years old, Reeves was administered the Wechsler Intelligence Scale for Children, Revised (“WISC-R”), and he attained a verbal IQ score of 75, a performance IQ score of 74, and a full-scale IQ score of 73. At that time, Reeves *730 was classified as being in the borderline range of intellectual functioning, but was described as having “severe deficiencies in non-verbal social intelligence skills and his ability to see consequences.” (C. 1590.) Reeves was subsequently expelled from school for behavioral reasons.
Reeves also presented testimony from John R. Goff, a neuropsychologist who evaluated Reeves for purposes of the post-conviction proceedings to determine whether Reeves was intellectually disabled. As part of his evaluation, Dr. Goff examined Reeves’s childhood and adolescent records and administered a battery of tests to Reeves. First, Dr. Goff administered the Wechsler Adult Intelligence Scale, Third Edition (“WAIS-III”), on which Reeves attained a verbal IQ score of 71, a performance IQ score of 76, and a full-scale IQ score of 71.
However, Dr. Goff stated that Reeves’s full-scale IQ score of 71 should be adjusted downward for the SEM, which he initially said was plus or minus 2 points but later said on cross-examination was plus or minus 5 points, and for the “Flynn Effect.” Dr. Goff explained that the first requirement for a diagnosis of intellectual disability is significantly subaverage intellectual functioning, which generally requires the person to have an IQ of approximately 70 or below. However, Dr. Goff said that research had shown that scores on IQ tests tend to get higher year after year by approximately 0.3 points per year. According to Dr. Goff, this increase in scores, known as the “Flynn Effect,” requires that the IQ test be “normed” periodically so that the mean score on the test stays the same. Dr. Goff testified that the WAIS-III was last “normed” in 1996, 10 years before he administered the test to Reeves. According to Goff, the “Flynn Effect” is recognized as valid and requires that 0.3 points be deducted from the full-scale IQ score achieved on an IQ test for each year since the test was last normed. ■
Reeves’s “adjusted” full-scale IQ score on the WAIS-III, Dr. Goff said, was 66. To reach this conclusion, Dr. Goff subtracted three points for the “Flynn Effect” and subtracted an additional two points for the SEM. However, Dr. Goff said that for purposes of diagnosing Reeves as intellectually disabled “[i]t doesn’t matter” whether his full-scale IQ score was adjusted “because the criteria is that the IQ score has to be around 70 [and] he qualifies because 71 is around 70.”[9] (R. 43.) Dr. Goff also testified that Reeves’s full-scale IQ score of 73 on the WISC-R that was administered to him in 1992, if adjusted solely for the “Flynn Effect,” would have been 67.6. Dr. Goff testified that Reeves’s IQ score in 1992 was “statistically identical” to his IQ score in 2006. (R. 45.) Additionally, Dr. Goff said, Dr. Kathy Ro-nan, who had evaluated Reeves in 1997 before Reeves’s trial to determine Reeves’s competency to stand trial and his mental state at the time of the offense, had administered the verbal portion of the Wechsler Adult Intelligence Scale, Revised (“WAIS-R”), the predecessor to the WAIS-III, and that Reeves had achieved a verbal IQ score of 74 at that time. Dr. Goff said that if that score were adjusted for the “Flynn Effect,” it would be 69.2.
On cross-examination, Dr. Goff admitted that an article had been published in 2006, the year the evidentiary hearing was held, by Dr. James Flynn, the psychologist after whom the “Flynn Effect” was named, in which Dr. Flynn admitted that the “Flynn Effect” had not, in fact, been generally accepted as scientifically valid. Dr. Goff *731 also admitted on cross-examination that he did not begin adjusting IQ scores for the “Flynn Effect” until approximately a year and a half before the evidentiary hearing, even though the first article about the phenomenon was published in 1984, some 22 years before the hearing. He also admitted that the “scoring manual” for the WAIS-III does not require the use of the “Flynn Effect” to get an accurate IQ score, and that' the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (“DSM-IV”), does not mention the “Flynn Effect”; the DSM-IV mentions only the SEM of plus or minus five points. Dr. Goff also said that he would not have adjusted Reeves’s IQ score for the “Flynn Effect” if he had evaluated Reeves in 1997, before Reeves’s trial, but he maintained that he would still have concluded that Reeves was intellectually disabled. Without the “Flynn Effect,” but considering the SEM, Dr. Goff said, Reeves’s full-scale IQ score would fall between 66 and 76. Finally, Dr. Goff stated that Reeves would not qualify to be institutionalized for intellectual disability based on his IQ scores, although Reeves “might qualify” for placement in a group home for the intellectually disabled. (R. 85.)
Dr. Goff testified that he also administered two tests to Reeves to determine whether he was malingering on the IQ test—the “Test of Malingered Memory” and the “21-Item Test.” (R. 48.) Dr. Goff said that these tests indicated that Reeves was not malingering, but “was putting forth a genuine effort.” (R. 49.)
Dr. Goff also administered a portion of the Halstead-Reitan Neuropsychological Test battery, which assesses a person’s neuropsychological functioning and cognitive abilities. Dr. Goff said that Reeves scored poorly on those tests and that Reeves did not even complete one of the tests because “[hjalfway through ... he had made enough errors so that it wasn’t necessary to continue the test because we had come to the conclusion that he couldn’t do it.” (R. 39.) Dr. Goff said that Reeves’s performance on the Halstead-Reitan tests was “not -inconsistent with” and “would tend to” support a conclusion that Reeves was intellectually disabled. (R. 40.)
Dr. Goff further testified that he administered “the abbreviated version of the second edition of the Wechsler Individual Achievement Test,” which assesses functional academics, one of the areas of adaptive functioning considered in evaluating whether someone is intellectually disabled. (R. 37.) Dr. Goff stated that this test indicated that Reeves could read at a third-grade level, that he could do math at a fourth-grade level, and that he could spell at a fifth-grade level, thus showing a deficit in functional academics. Dr. Goff described Reeves as illiterate because Reeves could not read at a fifth-grade level. Dr. Goff stated that Reeves was able to do basic multiplication and two-digit subtraction and addition, but stated that he could not do multi-digit multiplication, use decimals, or do division. When questioned by the circuit court, Dr. Goff said that generally a person with a low IQ will also have deficits in functional' academics. However, Dr. Goff said, most mildly intellectually disabled people can learn to read at about a fifth- or sixth-grade level and that that level of reading would not qualify as a significant deficit in functional academies.
Dr. Goff testified that another test for adaptive'functioning is the Adaptive Behavior Assessment System Test (“ABAS test”), which Dr. Goff said, is administered not to the individual being evaluated but to someone who is close to and familiar with the individual being evaluated. The ABAS test is “normed against the general popula *732 tion” to determine how a person’s abilities compare to the general population, as opposed to just the intellectually disabled population. (R. 59.) Dr. Goff administered this test to Beverly Seroy, who appears to have been the former stepmother of Reeves’s brother, Julius, and with whom Reeves had lived off and on for a period' of time before the murder. Dr. Goff testified that he interviewed Seroy for 45 minutes before -administering the test to her ■ to determine whether she knew Reeves well enough to complete:the test. Dr. Goff said that Seroy had told him that “she thought she knew [Reeves] very well.” (R. 62.) Dr. Goff also said that Seroy was able to provide him with “some historical information”' about- Reeves. (R. 62.) Thus, Dr. Goff concluded, Seroy was an appropriate person to whom to administer the ABAS test.[10] Dr. Goff further testified that he did not administer' the ABAS test to Reeves’s mother because (1) he did not know how to contact her; (2) he had been told that she was mentally ill; and (3) mothers aré “not necessarily” the best people to administer the test to because, he said, they either tend to “overestimate the capacities of their offspring” or tend to “underestimate the capacities of their offspring.” (R. 70.) When questioned by the circuit court about the ABAS test, which indicated that Seroy had “simply guessed” on 19 of the 24 questions regarding the “work” area of adaptive functioning, Dr. Goff stated that Seroy’s guessing “does cast some doubt as to the validity of , that particular finding,” i.e., the finding by Dr. Goff that Reeves had significant deficits in the work area of adaptive functioning. (R. 71.)
Dr. Goff testified that the results- of the ABAS test indicated that Reeves had significant deficits in the following areas of adaptive functioning: health and safety, which . Dr. Goff described as whether a person looks both, ways before crossing the street, whether a person knows how to get to: a hospital if necessary, and. whether a person can take care of personal health needs, such as brushing teeth, taking medications, and getting an annual physical; self-care, which Dr. Goff said overlaps with health and safety, but also includes such things as whether the person can prepare food, can pay the bills, or can get a haircut when necessary without being told; self-direction; functional academics; leisure activities, which Dr. Goff described as how a person spends , his or her free time, i.e., whether the person spends it productively or in goal-directed activities or whether the person “just kind of like hang[s] out and do[esn’t] ever do anything in [his or her] leisure time activities” (R. 57); and work, which Dr. Goff described as whether the person has a job, whether the person arrives on time to the job, and whether the person gets along with coworkers. Dr. Goffs written report indicates that Reeves scored iii the 16th percentile in the area of communication; in the 9th percentile in the areas of community use and home living; in the 5th percentile in the areas of functional academics, self-direction, leisure, and social skills; in the 4th percentile in the area of work; and in the 2nd percentile in the areas of health and safety and self-care. (G. 701.) Dr. Goff admitted on cross-examination that he did not consider Reeves’s actions surrounding the murder in assessing Reeves’s- adaptive functioning; Dr. Goff said that Reeves’s actions (surrounding the murder were not *733 relevant to determining whether Reeves was intellectually disabled. Dr. Goff also admitted on cross-examination that it was “not surprising” that Reeves’s adaptive functioning was “low” because, he said, “[m]ost people in prison have low adaptive skills.” (R. 88.)
Based on Reeves’s “adjusted” IQ scores, the results of the ABAS test, and all the other information before him, Dr. Goff concluded that Reeves suffered from significantly subaverage intellectual functioning and significant deficits in multiple areas of adaptive functioning and that both manifested themselves before Reeves was 18 years old. Therefore, Dr. Goff concluded that Reeves was intellectually disabled.
Reeves also presented testimony from Karen Salekin, a forensic and developmental psychologist, who conducted a mitigation investigation for purposes of the postconviction proceedings. Dr. Salekin’s testimony centered around her investigation of mitigating, evidence, specifically, her assessment of risk factors in Reeves’s life—i.e., factors that negatively influenced Reeves’s development—and protective factors in Reeves’s life—i.e., factors that positively influenced Reeves’s development. The bulk of that testimony need not be repeated for purposes of this issue. Pertinent to Reeves’s intellectual-disability claim, Dr. Salekin testified that Reeves’s school records indicated that he had struggled in school from an early age and that he had “lower intelligence.” (R. 179.) However, she said that Reeves’s largely “untreated” attention-deficit disorder with hyperactivity contributed to his struggles in school. (R. 179.) Dr. Salekin also testified that Reeves had attained a full-scale IQ score of 73 in 1992. She concurred with Dr. Goff that the “Flynn Effect” is recognized as valid and requires that IQ scores be adjusted downward.
Dr. Salekin further testified that Reeves’s brother, Julius,- had had a negative impact on Reeves, and that, although younger than Reeves, Julius was the leader of the two. Dr. Salekin stated that her investigation revealed that Reeves was kind and considerate and that he could follow directions when he was not around Julius and that it was only when he was around Julius that his behavior deteriorated. For example, Dr. Salekin testified that Jerry Ellis had employed Reeves at his construction company for approximately three months around , the time of the crime. Dr. Salekin said that Ellis reported that Reeves was a good employee— Reeves arrived at work on time, was responsive to directions, was motivated, had a, “really good work ethic,” and “was responsible.” (R. 140.) However, Reeves was employed by Ellis only during the time Julius was in a juvenile-detention facility. Dr. Salekin said that once Julius was released from juvenile detention, Reeves never went back to work. Dr. Salekin also testified that her investigation revealed that Reeves lived “intermittently” with Beverly Seroy because his mother’s house was too crowded. (R. 193.) Dr. Salekin said that Seroy provided Reeves with structure when he lived with her, requiring that Reeves obey the rules, do his homework, do chores, and abide by a curfew. Dr. Salekin said that Seroy reported that Reeves did well when he lived with her, often helping her take cáre of her own children, and that Seroy “trusted [Reeves] implicitly” to babysit her children. (R. 194.) At one point, Dr. Salekin said, Seroy even hired a tutor to help Reeves with his: schoolwork and would drive Reeves to the library so that he could earn his GED.[11]
In rebuttal, the State called Glen David King, a clinical and forensic psychologist *734 who also evaluated Reeves for the postcon-viction proceedings to determine whether Reeves was intellectually disabled. Dr. King, like Dr. Goff, had looked at various records relating to Reeves and administered a battery of tests to Reeves. Dr. King also had looked at the testimony of Reeves’s mother during Reeves’s trial and at Dr. Goffs data. Dr. King testified that he administered to Reeves the WAIS-III and that Reeves attained a verbal IQ score of 69, a performance IQ score of 73, and a full-scale IQ score of 68. Dr. King described the “Flynn Effect” as “a theoretical position” that there is “an increase in performance” on IQ tests “such that IQ scores seem to rise gradually over a period of time.” (R. 242.) However, Dr. King said that the “Flynn Effect” is not required to be taken into account when evaluating someone for intellectual disability and that the “Flynn Effect” is “not settled” in the “psychological community.” (R. 244-45.)
Dr. King also administered the Wide Range Achievement Test to determine Reeves’s reading, spelling, and math abilities. Dr. King said that the test indicated that Reeves could read at a fifth-grade level, that he could spell at a fifth-grade level, and that he could do arithmetic at a fourth-grade level. With respect to arithmetic, Dr. King said, Reeves was able to do addition, subtraction, multiplication, and simple division. Dr. King said that Reeves’s scores on the achievement test were “higher than ordinarily would be predicted by the IQ test” he had administered to Reeves. (R. 224.) In other words, Reeves’s achievement-test scores “indicate[d] a level of functioning higher than the IQ scores actually indicated.” (R. 224.) Dr. King said that because of the discrepancy between Reeves’s scores on the IQ test and the achievement test, those scores were not adequate, by themselves, for him to reach a conclusion as to whether Reeves was intellectually disabled.
Dr. King also administered all but one of the tests that are included in the Hal-stead-Reitan Neuropsychological Test battery.[12] The Halstead-Reitan tests, Dr. King said, are used to determine if a person has any impairment in brain function. Dr. King said that Reeves had no impairment in “sensory perceptional functioning,” which he said indicates whether a person is properly receiving external stimuli. (R. 236.) Dr. King said that Reeves had some impairment in his motor functioning. Although he had “good motor strength in his upper limb[s],” Reeves had impairment in fíne motor coordination, such as tapping his fingers. (R. 237.) Dr. King stated that he could not explain “exactly why” Reeves had impairment in fine motor coordination, although sometimes deficits in this test will appear when the test is administered to a person with lower IQ. With respect to attention, concentration, and memory, Dr. King testified that Reeves had good attention and concentration, but that he scored “below average” with respect to memory. (R. 239.) Nonetheless, Dr. King said, Reeves was able to recall in “fairly good detail ... historical events such as where he went to school and what happened when and who represented him at trial and things of that nature.” (R. 239.) With respect to “language skills,” Dr. King said, Reeves was “below average.” (R. 240.) With respect to “visual spacial skills,” which Dr. King described as “[t]he ability to copy designs,” Dr. King testified that Reeves had “some impairment.” (R. 240.) Specifically, Dr. King said that Reeves was “actually able to copy designs very accurately most of the time [but he had] problems with more *735 complex designs.” (R. 240-41.) As for “reasoning and logical analysis,” which Dr. King described as “higher cortical functioning, ability to engage in abstract reasoning, concept formation, problem solving, taking new information and being able to apply it to solve problems,” Reeves “performed well below average.” (R. 241.) Dr. King stated that this indicated only that Reeves was “slower to learn new things,” not that he “can’t learn,” and that, in his opinion, Reeves had “some impairment” in this area. (R. 241.) Dr. King testified that Reeves’s results on the Hal-stead-Reitan tests were consistent with Reeves’s being in the borderline range of intellectual functioning, as opposed to the intellectual-disability range of functioning.
Dr. King also administered to Reeves the Adaptive Behavior Scale, Residential and Community, Second Edition (“ABS-RC-II”). Dr. King stated that this test is one of the tests recommended by the American Association on Intellectual and Developmental Disabilities for measuring adaptive functioning. The test measures skill level in several different “domains.” (R. 226.) To score the test, Dr. King said, the test giver uses information provided by the test subject, the test giver’s observations, and information from other individuals who know the test subject. Dr. King stated that the ABS-RC-II is “normed” or scored, not against the population as a whole, but against those in the borderline range of intellectual functioning and those who are intellectually disabled. Dr. King said that this is because “the AAMR has taken the position that in order to diagnose somebody as mentally retarded, their adaptive abilities have to be substantially below that particular group.for which [the test] is normed.” (R. 267.) However, on cross-examination, Dr. King conceded that the Mental Retardation Definition Classification and Systems of Support, 10th edition, a text published by the American Association on Intellectual and Developmental Disabilities, states: “For diagnosis, significant limitations, in adaptive behaviors should be established through the use of standardized measures normed on the general population including people with disabilities and people without disabilities.” (R. 274.)
Dr. King obtained scores on the ABS-RC-II from Reeves in 10 different “domains” of adaptive functioning. Dr. King testified that Reeves scored in the 99th percentile in the domain of independent functioning, which Dr. King described as “behaviors that have to do with things like use of table utensils, personal hygiene, being able to dress oneself, and a sense of direction, for example, use of transportation,” essentially things “that an individual who can function independently would have to engage in every day in order to take care of themselves.” (R. 227.) Reeves scored in the 98th percentile in the domain of physical development, which Dr. King said simply examines whether a person has any physical disability. In the numbers and time domain,' Reeves also scored in the 98th percentile. Reeves was able to tell time and do addition, subtraction and multiplication. As noted previously, Dr. King also testified that Reeves was able to do simple division.
In the domain of language development, Reeves scored in the 84th percentile. Dr. King said that Reeves has much better verbal communication than written communication, but that Reeves was nonethe-' less able “at least to get his idea across” in written form.. (R. 229.) For example, Dr. King cited a letter Reeves had written in which Reeves ‘had indicated that he was not interested in going to school because he could make more money selling drugs. Dr. King stated that, although “[t]he syntax of the letter was not really very good,” *736 Reeves was nonetheless able to get his “message across” in the letter* (R. 229.)
Reeves also scored in the 84th percentile in the responsibility and socialization domains. The responsibility' domain, Dr. King said, includes such things as “[t]aking care of personal belongings, general responsibility, personal responsibility,' like maintaining self control, understanding concepts of being on time.” (R, 232.) Socialization, Dr. King said, included such things as “[c]ooperation, consideration for others, awareness of others, interaction with others, participation in group activities.” (R. 233.) Dr. King also said that in the many hours he spent with Reeves, Reeves was “quite cooperative and easy to get along with.” (R. 233.)
Reeves scored in the 63rd percentile in the domain of economic activity, which “has to do with the handling of money, banking activities, budgeting, being able to run errands, purchasing things, being able to use shopping resources.” (R. 228.) With respect to this domain, Dr. King said that Reeves was able to handle his own money, to pay bills, and to purchase personal items, but that Reeves had never used a credit card.
In the domestic-activity domain, Reeves scored in the 25th percentile. Dr. King said the domestic-activity domain includes such things a “room cleaning, doing laundry, table setting, food preparation, table clearing.” (R. 230.) Dr. King said that, based on all the information he had, Reeves had never been required to do any type of domestic activity growing up and had been incarcerated since he was 18 years old. Therefore, Dr. King said, “he scored very low on those kinds of activities because I couldn’t in good conscience rate him highly on those things. I didn’t have any data to support it.” (R. 230.)
Reeves also scored in the 25th percentile in the domains of prevocational/vocational activity and self-direction. Prevocational/vocational activity, Dr. King said, “has to do with job complexity, work, school, job performance and work school habits.” (R. 230.) Dr. King said that Reeves scored low in this domain because “[h]e did not get to the age where he might be able to m'aster use of complex job tools or equipment” and because school records indicated that Reeves often missed school and had “pretty poor school habits.” (R. 230-31.)
Self-direction, Dr. King said, “has to do with showing initiative, attention, persistence and directing one’s own activities.” (R. 231.) Dr. King said that he scored Reeves low in this domain but that since the testing, he had had the opportunity to speak with Detective Pat Grindle, an officer with the Selma Police Department, who had known Reeves “quite well” since Reeves was about nine years old. (R. 231.) Dr. King said that Det. Grindle told him that from an early age, Reeves “was involved in a lot of drug activity and was actually directing the behaviors and activities of. others in this drug related activity.” (R. 231-32.) The degree of Reeves’s involvement in drug activity, including not only what Det. Grindle- reported but also Reeves’s admission to Dr. King that he made between $1500 and $2000 a week selling drugs and was able to purchase his own car, Dr. King said, “would indicate much more self-direction than the way that I rated him.” (R. 232.)
Based on his testing of Reeves and all the other information before him, Dr. King concluded that Reeves was in the borderline range of intellectual ability, but was not intellectually disabled.
' On cross-examination, Dr. King admitted that he did not speak to any of Reeves’s family members in conducting his evaluation. However, he said that there *737 was information in many of the records he examined that was inconsistent with a finding of intellectual' disability. Specifically, Dr. King said that Reeves’s repeated IQ scores of over 70, and his placement in “emotional conflict classes” in school as opposed to placement in “special education for mental retardation services” were inconsistent with a finding of intellectual disability. (R. 253.) Dr. King also stated on cross-examination that, based strictly on the IQ test-he administered, Reeves satisfied the first prong for determining intellectual disability—significantly subaverage intellectual functioning—because Reeves achieved a full-scale IQ score of 68.
In its order, the circuit court found that Reeves had failed to satisfy his burden of proving that he was intellectually disabled. After summarizing the testimony presented at the hearing and the relevant law, the court explained:
“There is no dispute that Reeves’s IQ is sub-average. However, the expert testimony about Reeves’s adaptive functioning was conflicting. Before addressing the merits of Reeves’s mental retardation claim, this Court believes it should first discuss the conflicting expert testimony about the Flynn Effect.
“Dr. Goff and Dr. Salekin indicated that the Flynn Effect is accepted in the scientific community while Dr. King stated that it was not. The Court notes that Dr. Goff testified that Dr. Flynn published his findings in 1984. However, Dr. Goff did not start utilizing the Flynn Effect until 2005—years after the Flynn Effect came into existence. There was no dispute that neither the publishers of the IQ tests , administered on Reeves nor the DSM-IV require that the Flynn Effect must be utilized in determining a person’s intellectual functioning. While there was testimony that appellate courts outside of- Alabama have addressed the application of the Flynn Effect, this Court is unaware of any Alabama caselaw requiring use of the Flynn Effect.[13] It does not appear to this Court that the issue of whether the Flynn Effect should be considered when reviewing an individual’s IQ score, at least in Alabama, is settled in the scientific community.
. “Reeves achieved .a full scale IQ score of 73 on a test administered when he was 14 years old. The full scale IQ score of 71 achieved by Reeves on the test administered by Dr. Goff is consistent with his prior IQ score of 73. See Ex parte Smith, 213 So.3d 214 (Ala.2003) (holding that a full scale IQ score of 72 .‘seriously undermines any conclusion that [a defendant] suffers from significantly sub-average intellectual functioning contemplated under even the broadest definitions [of mental retardation]’). Further, Reeves testified during a pretrial suppression hearing and the Court recalls nothing indicating that Reeves’s intellectual functioning was significantly sub-average. See Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir.1994) (holding that Clisby’s testimony gave the trial judge ‘an opportunity to gauge roughly his intelligence’). This Court concludes that Reeves’s intellectual functioning, while certainly sub-average, is not significantly sub-average.
“A review of the trial transcript indicates that Reeves does not suffer from significant or substantial limitations in his adaptive functioning. Testimony at trial indicated that Reeves was a gang *738 member. Further, Reeves’s mother testified that while Reeves attended Job Corp he earned certificates in welding, brick masonry, and auto mechanics— jobs that would require some degree of technical skill. Reeves’s mother also testified that after he returned from Job Corp that Reeves worked for Jerry Ellis doing carpentry and roofing. While he worked for Mr. Ellis, Reeves would get up as early as 5:30 a.m. to be ready for work. It was only after his younger bother Julius returned from being confined in the juvenile facility at Mt. Meigs that Reeves chose to stop working for Mr. Ellis. According to his mother, Reeves went with Julius because he was afraid his brother would get shot. Reeves had extensive contact with juvenile authorities and with law enforcement prior to his arrest for the victim’s murder. In a pretrial mental evaluation, Dr. Kathy Ronan diagnosed Reeves as suffering from Adaptive Paranoia— that is, he adapted his behavior in order to survive in the dangerous environment in which he lived. Reeves reported to Dr. King that he sold drugs and sometimes made between $1500 and $2000 per week. Reeves used the money from his drug dealing to purchase clothes, food, and a car.
“The record also reveals that Reeves and his codefendants planned to commit a robbery. It is undisputed that Reeves actively participated in the planning of the robbery. There was no evidence presented at the evidentiary hearing suggesting that Reeves’s participation in the planning of the robbery or the ultimate murder and robbery of the victim was the result of being coerced or threatened by another person. The evidence from trial, including the compelling testimony from one of Reeves’s co-defendants, proved beyond a reasonable [doubt] that it was Reeves, and Reeves alone, that decided to murder the victim. After he shot the victim, Reeves hid incriminating items of evidence, including the murder weapon and bloody clothes that he and his codefendants had worn. In addition, Reeves split the proceeds with his codefendants, was boastful to others about shooting the victim, and seemed proud that he might get a tear drop—a gang symbol indicating that a gang member had killed another person. See Ex parte Smith, [213 So.3d at 250] (wherein the court considered Smith’s actions after committing murder as a factor in concluding that Smith ‘does not suffer from deficits in his adaptive functioning’).
‘“In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded and thus ineligible for the death penalty.’ Ex parte Smith, 213 So.3d 239, 252 (Ala. 2007). After considering the evidence presented at Reeves’s trial and the evidence presented at the evidentiary hearing, this Court concludes that Reeves failed to meet his burden of proving by a preponderance of evidence that he is mentally retarded and that his death sentence violates the Eighth Amendment. Rule 32.3, Ala. R.Crim. P. This claim for relief is, therefore, denied.”
(C. 949-53.)
With respect to the intellectual-functioning prong of intellectual disability, Reeves contends that “[i]t is undisputed that [he] has significantly subaverage intellectual functioning” and that the circuit court erred in finding that he did not. (Reeves’s brief, p. 41.) Specifically, Reeves asserts that the circuit court erred in rejecting the “Flynn Effect” and in not deducting points from his IQ scores to account for that phenomenon. Reeves also appears to as *739 sert that the circuit court was required to find that he suffered from significantly subaverage intellectual functioning because, he says, all three of his IQ scores fell within the range of significantly subav-erage intellectual functioning, i.e., between 70 and 75 or below, when considering the SEM, and one of his scores was below 70 even without consideration of the SEM.[14]
We reject Reeves’s argument that the circuit court erred in rejecting the “Flynn Effect” and in not deducting points from his IQ scores to account for that phenomenon. This Court has repeatedly held that a circuit court is not required to accept, consider, or apply the “Flynn Effect” in determining intellectual disability. See Carroll v. State, 215 So.3d 1135, 1151 (Ala.Crim.App.2015) (“[T]he circuit court could have reasonably rejected the ‘Flynn Effect.’ ”); Smith v. State, 112 So.3d 1108, 1131 (Ala.Crim.App.2012) (“[T]his Court has previously held on several occasions that a trial court need not accept the ‘Flynn Effect’ as binding, and that it has not been accepted as scientifically valid by all courts.”); and Albarran v. State, 96 So.3d 131, 200 (Ala.Crim.App.2011) (“[T]he circuit court could have reasonably rejected the ‘Flynn Effect.’ ”). As noted above, Dr. King testified that it is not required that the “Flynn Effect” be taken into account when evaluating someone for intellectual disability and that the “Flynn Effect” is “not settled” in the “psychological community.” (R. 244-45.) Although Dr. Goff and Dr. Salekin both testified that the “Flynn Effect” is generally recognized as valid, Dr. Goff admitted that he did not use the “Flynn Effect” for over 20 years after it was first discovered. He also admitted that Dr. Flynn himself, the psychologist who had discovered the “Flynn Effect,” had stated in a recent article that the “Flynn Effect” had not, in fact, been generally accepted as valid. Finally, Dr. Goff admitted that the “scoring manual” for the WAIS-III does not require the use of the “Flynn Effect” to get an accurate IQ score and that the DSM-IV also does not mention the “Flynn Effect” or require its application to IQ scores. Therefore, the circuit court did not err in rejecting the “Flynn Effect” and in not deducting points from Reeves’s IQ scores to account for that phenomenon.
We also reject Reeves’s argument that the circuit court erred in not considering the SEM. Nothing in the circuit court’s order indicates that the court did not consider the SEM in evaluating Reeves’s claim. Although the circuit court did not specifically mention the SEM in its order, it did state that it had considered all the evidence presented at the evidentiary *740 hearing and that evidence- included testimony about the SEM.
We further reject Reeves’s argument that the circuit court was required- to find thát he suffered from significantly subav-erage intellectual functioning because, he says, all of his IQ scores fell within the range of significantly subaverage intellectual functioning when the SEM is considered and one of his IQ scores was below 70 even without consideration of the SEM. As noted above, in Hall, the United States Supreme Court recognized that an IQ score, alone, is not determinative of intellectual disability or even of the intellectual-functioning prong of intellectual disability. The Court explained that because of the imprecision in intelligence testing, an IQ score should be considered a range, not á fixed number. Subsequently, the United States Court of Appeals for the Fifth Circuit explained:
“The consideration of SEM as discussed by the Supreme Court, however, is not a one-way ratchet. The imprecision of IQ testing not only provides that IQ scores above 70 but within the SEM do not conclusively establish a lack of significantly subaverage' general intellectual functioning, but also that IQ scores below 70 but. within the SEM do not conclusively establish the opposite. In other words, a sentencing court may find a defendant to have failed to meet the first prong of the AAMR’s definition of intellectual disability even if his IQ score is below 70 so long as 70 is within the margin of error and other evidence presented provides sufficient evidence of his intellectual functioning,”
Mays v. Stephens, 757 F.3d 211, 218 n. 17 (5th Cir.2014). The United States Court of Appeals for the Eleventh Circuit has similarly recognized that
“[t]he standard. error of measurement accounts for a margin of. error both below and above the IQ test-taker’s score. As the Fifth Circuit recently concluded, the U.S. Supreme Court’s consideration of-the standard error of measurement ‘is not a'one-way ratchet.’ Mays v. Stephens, 757 F.3d 211, 218 n. 17 (5th Cir. 2014). We agree with the Fifth Circuit that the standard error of measurement is merely a factor to consider when assessing an individual’s intellectual functioning—one that may benefit or hurt that individual’s Atkins [v. Virginia, 536 U.S. 304 (2002),] claim, depending on the content and quality of expert testimony presented. Further, the standard error of measurement is a bi-directional concept that does not carry with it a presumption that an individual’s IQ falls to the bottom of his IQ range.
“While Hall [v. Florida, 572 U.S. -, 134 S.Ct. 1986 (2014),] requires lower courts at least to consider the standard error of measurement when evaluating intellectual functioning, it does not, as Ledford contends, require lower courts to find that an IQ score of 75 or below necessarily satisfies the significantly subaverage intellectual functioning prong. In fact, the Supreme Court steers us away from such rigid assertions by emphasizing that an IQ score represents a ‘range, not a fixed number,’ Hall, 572 U.S. at -, 134 S.Ct. at 1999,
“A district court’s actual application of the standard error of measurement—i.e. whether the concept would make a finding of significantly subaverage intellectual function more likely, less likely, ‘or have no effect on the court’s determination—is a matter of fact-finding informed by testimony from expert witnesses. See Conner [v. GDCP Warden], 784 F.3d [752,] 766 [(11th Cir.2015)]; Thomas [v. Allen], 607 F.3d [749,] 758 [ (11th Cir.2010) ]. So long as the district court’s findings regarding how the stan *741 dard error of-measurement informs its ultimate intellectual functioning determination are plausible in light of the record evidence viewed in its entirety, there will be no clear error.”
Ledford v. Warden, Georgia Diagnostic & Classification Prison, 818 F.3d 600, 640-41 (11th Cir.2016).
In this case, Reeves- had full-scale IQ scores of 68, 71, and 73. Considering the SEM, these scores indicate that Reeves’s IQ could be as low as 63 or as high as 78. Reeves’s expert, Dr. Goff, concluded, based on Reeves’s IQ scores as well as all other information before him, that Reeves suffered from significantly subaverage intellectual functioning. On the other hand, the State’s expert, Dr. King, concluded, based on Reeves’s IQ scores'-and all other information before him, that Reeves falls within the borderline range of intellectual functioning. . The circuit court, after considering all the evidence presented at the hearing, and after observing Reeves when Reeves testified at a pretrial hearing, resolved the conflicting expert testimony as to Reeves’s intellectual functioning adversely to Reeves, finding that, although Reeves’s intellectual functioning was subaverage, it was not significantly subaverage as required to meet the first prong of intellectual disability. “Conflicting evidence is. always a question for the finder of fact to determine, and a verdict rendered thereon will not.be disturbed on appeal.” Padgett v. State, 668 So.2d 78, 86 (Ala.Crim.App.1995). There is ample evidence in the record to support the circuit court’s finding and we will not disturb the circuit court’s resolution of the conflicting • expert testimony. Therefore, we find no abuse of discretion on the part of the circuit court in concluding that Reeves failed to prove by a preponderance of the evidence that he suffered from significantly subaverage intellectual functioning.
As for the adaptive-functioning prong of intellectual disability, Reeves contends that he “presented evidence of significant deficits in at least six areas of adaptive functioning and therefore [he] meets”- the requirements for the second prong of intellectual disability—significant deficits in at least two areas of adaptive functioning— and that the circuit court erred in not so finding. (Reeves’s brief, p. 45.) Specifically, Reeves asserts that the circuit court “erroneously discounted Dr. Goffs findings by pointing to anecdotal tasks that Mr. Reeves can perform, such as his purported planning of the crime, his earning of Job Corps certificates in welding, brick masonry, and auto mechanics, his extremely brief construction employment, and his purported drug selling activities,” none of which, Reeves claims, undermines or refutes Dr. Goffs opinion that Reeves suffers from significant deficits in multiple areas of adaptive functioning. (Reeves’s brief, pp. 50-51.) At oral argument, Reeves further argued that even discounting Dr. Goffs testimony, Dr. King testified that on the ABS-RC-II test, Reeves scored in the 25th percentile in the prevocational/voca-tional, self-direction, and domestic-activity domains,, thus conclusively establishing that Reeves suffered significant deficits in those three areas of adaptive functioning. Therefore, Reeves concludes, the circuit court was required to find that he suffered from significant deficits in at least two areas of adaptive functioning.
Reeves’s arguments in this regard appear to be based solely on his scores on the ABAS test administered by Dr. Goff and the ABS-RC-II test administered by Dr. King. However, contrary to Reeves’s apparent belief, a circuit court is not required to find that a person suffers from significant deficits in adaptive functioning *742 merely because that person’s scores on a standardized test indicate such deficits. Just as an IQ test is necessarily imprecise and, therefore, not determinative of the intellectual-functioning prong of intellectual disability, standardized tests for adaptive functioning are also necessarily imprecise and, therefore, are not determinative of the adaptive-functioning prong of intellectual disability. Cf., United States v. Davis, 611 F.Supp.2d 472, 493 (D.Maryland, 2009) (noting that “nearly all methods of assessing an individual’s adaptive functioning—particularly in a retroactive analysis—are imperfect” and that, therefore, “the typical approach used in forensic assessments of adaptive functioning is to collect information from a multitude of sources and look for convergence of findings in order to confirm one’s conclusions”); and Singleton v. Astrue, (No. 2:11CV512-CSC, February 29, 2012) (M.D.Ala.2012) (not reported in F.Supp.2d) (noting that scores on the ABAS-II test are not determinative as to adaptive functioning for purposes of qualification for Social Security disability). Although standardized tests for adaptive functioning are certainly useful in assessing a person’s adaptive functioning, a court should assess such test scores in light of the circumstances of each case and in light of all other relevant evidence regarding adaptive functioning, including the person’s actions at the time of the crime.
In this case, the evidence regarding Reeves’s adaptive functioning was conflicting. Although Reeves scored low in the domains of domestic activity, self-direction, and work on the ABS-RC-II test administered by Dr. King and in the areas of self-direction, work, leisure activities, health and safety, self-care, and functional academics on the ABAS test administered by Dr. Goff, thus indicating significant deficits in those areas of adaptive functioning, other evidence was presented that either called into question the validity of those scores and/or indicated that Reeves’s deficits in those areas were not, in fact, significant.
For example, Dr. King testified that Reeves scored in the 25th percentile in the domain of domestic activity because Reeves had never been required to do any type of domestic activity growing up and had been incarcerated since he was 18 years old. Dr. Goff testified that it is not unusual for someone who is incarcerated to have low adaptive functioning. Dr. King also testified that he would have scored Reeves higher in the self-direction domain if he had known at the time that he evaluated Reeves that, from an early age, Reeves had been “involved in a lot of drug activity and was actually directing the behaviors and activities of others in this drug related activity.” (R. 231-32.) Additionally, Reeves was described in his juvenile mental-health records as “extremely goal-directed,” even at a young age. (C. 1556.)
Dr. King further testified that he believed that Reeves’s low score in the work domain was because Reeves “did not get to the age where he might be able to master use of complex job tools or equipment” before he went to prison, and because school records indicated that Reeves often missed school and had “pretty poor school habits.” (R. 230-31.) Dr. Goff concurred, stating that Reeves’s deficit in the work area “may be because he had a lack of opportunity.” (R. 62.) Dr. Goff further testified that the validity of Reeves’s low score in this area was questionable in light of the fact that Beverly Seroy, the person to whom he administered the ABAS test, had simply guessed on the majority of questions in this area. Additionally, as the circuit court noted in its order, Reeves had obtained certificates in brick masonry, welding, and automobile mechanics, all of which require some level of technical skill, *743 and the record indicates that Reeves held a construction job while his brother was incarcerated and that he was a good employee. Furthermore, the evidence indicated that Reeves’s “poor school habits” were more a product of his defiant behavior in school than of any deficits in adaptive functioning.
Additionally, although Reeves scored low in the health and safety, self-care, and leisure-activity areas on the ABAS test administered by Dr. Goff, on the ABS-RC-II test administered by Dr. King, Reeves achieved the highest score possible in the domain of independent functioning, which included such things as self-care and health and safety, and Reeves also scored high in the domains of responsibility and socialization. Moreover, the evidence indicated that' Reeves sold drugs to make money and that he used that money to buy personal belongings for himself, including a car, and to help pay the household bills.
Finally, Reeves scored in the 5th. percentile in the area of functional academics on the ABAS test administered by Dr. Goff, and Dr. Goff testified that Reeves was functionally illiterate and could read only at a third-grade level and, therefore, that Reeves suffered from a significant defjcit in this area. However, Dr. Goff indicated that the ability to read at about a fifth- or sixth-grade level would not qualify as a significant deficit in functional academics. Dr. King testified that Reeves was able to read at a fifth-grade level, thus indicating that Reeves did not have a significant deficient in functional academics.
Simply put, the circuit court in this case was faced with conflicting evidence- regarding Reeves’s adaptive functioning, including conflicting expert testimony. Reeves’s expert, Dr. Goff, testified that Reeves suffered from significant deficits in six areas of adaptive functioning. On the other hand, the State’s expert, Dr. King, indicated that, although Reeves scored low on the ABS-RC-II test in three areas of adaptive functioning, those scores were questionable for various reasons. It was for the circuit court to resolve the conflicting evidence and the conflicting expert testimony, and it .obviously resolved the conflicts adversely to Reeves. In doing so, the court appropriately looked at evidence regarding Reeves’s adaptive functioning other than the expert testimony—such as Reeves’s technical abilities-in . brick masonry, welding, and automobile mechanics; Reeves’s ability, to work construction and do so reliably when he was not around his brother, Julius; Reeves’s participation in a drug-sale enterprise in which he was able to make thousands of dollars a week that he then used to purchase personal items and a car; and particularly Reeves’s cold and calculated actions surrounding the murder, including planning the robbery with his codefendants, hiding incriminating evidence after he had shot the victim, splitting the proceeds of the robbery with his codefendants, and bragging about the murder, claiming that he would earn a “teardrop”—a gang tattoo indicating that a gang member had killed someone—for the murder See, e.g., Ex parte Smith, 213 So.3d 313, 320 (Ala.2010) (“We find especially persuasive Smith’s behavior during the commission of these murders.”) There is ample evidence in the record to support the circuit court’s finding that Reeves did not suffer from significant deficits in at least two areas of adaptive functioning, and we will not disturb the circuit court’s resolution of the conflicting evidence. Therefore, we find no abuse of discretion on the part of the circuit court in finding that Reeves failed to prove by a preponderance of the evidence that he suffered from significant deficits in at least two areas of adaptive functioning.[15]
*744 For these reasons, the circuit court properly denied Reeves’s claim of intellectual disability.
III.
Reeves next contends that the circuit court erred in denying several of his claims of ineffective assistance of trial and appellate counsel.
“ ‘In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
“ ‘ “First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to . deprive the defendant of a fair trial, a trial whose result-is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable,”
“ ‘466 U.S. at 687, 104 S.Ct. at 2064.
“ ‘ “The performance component outlined in Strickland is an objective one: that is, whether counsel’s assistance, judged under ‘prevailing professional norms,’ was ‘reasonable considering all the circumstances.’ ” Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994), cert. denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) ], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. “A court deciding an actual ineffectiveness claim must .judge the reasonableness of counsel’s challenged conduct on the facts of the particular' case, viewed as of the time of -counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
“‘The claimant alleging ineffective assistance of counsel has- the burden of showing that counsel’s assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). “Once a petitioner has identified 'the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall ‘outside the wide range of professionally competent assistance.’ [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.” Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985). “This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate, all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel *745 rendered ineffective assistance.” Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 646 So.2d 326 (Ala.Cr.App.1994).
“‘“Judicial scrutiny, of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional' assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
“ ‘Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
““‘Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068.”
“ ‘Daniels, 650 So.2d at 552;
“‘“When a defendant challenges a death sentence such as the one at issue in this' case, 'the' question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”
“ ‘Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132 (Ala.Cr.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).

Hi i

“Bui v. State, 717 So.2d 6, 12-13 (Ala.Cr.App.1997), cert. denied, 717 So.2d 6 (Ala.[Crim.App.]1998).”
Dobyne v. State, 805 So.2d 733, 742-44 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001).
“The standards for determining whether appellate counsel was ineffective are the same as those for determining whether trial counsel was ineffective.” Jones v. State, 816 So.2d 1067, 1071 (Ala.Crim.App.2000), overruled on other grounds, Brown v. State, 903 So.2d 159 (Ala.Crim.App.2004). “The process of evaluating a ease and selecting those issues on which the appellant is most likely to prevail has been described as the hallmark of effective appellate advocacy.” Hamm v. State, 913 So.2d 460, 491 (Ala.Crim.App.2002). As this Court explained in Thomas v. State, 766 So.2d 860 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala. 2000), overruled on other grounds, Ex parte Taylor, 10 So.3d 1075 (Ala.2005):
*746 “As to claims of ineffective appellate counsel, an appellant has a clear right to effective assistance of counsel on first appeal. Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). However, appellate counsel has no constitutional obligation to raise every non-frivolous issue. Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The United States Supreme Court has recognized that ‘[experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.’ Jones v. Barnes, 463 U.S. at 751-52, 103 S.Ct. 3308. Such a winnowing process ‘far from being evidence of incompetence, is the hallmark of effective advocacy.’ Smith v. Murray, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal. Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir.1993), cert. denied, 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993). One claiming ineffective appellate counsel must show prejudice, i.e., the reasonable probability that, but for counsel’s errors, the petitioner would have prevailed on appeal. Miller v. Keeney, 882 F.2d 1428, 1434 and n. 9 (9th Cir.1989).”
766 So.2d at 876.
Moreover, in reviewing claims of ineffective assistance of counsel, this Court need not consider both prongs of the Strickland test. See Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App.1987) (“In determining whether a defendant has established his burden'of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs.”). Because both prongs of the Strickland test must be satisfied to establish ineffective assistance of counsel, the failure to establish one of the prongs is a valid basis, in and of itself, to deny the claim. As the United States Supreme Court explained:
“Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel’s performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel’s performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.”
Strickland, 466 U.S. at 697, 104 S.Ct. 2052.
In his petition, Reeves raised numerous claims of ineffective assistance of trial and appellate counsel; however, he does not pursue all of those claims in his brief on appeal. Those claims that Reeves raised in his petition but does not pursue on appeal are deemed abandoned and will not be considered by this Court. See Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”). As for the ineffective-assistance-of-counsel claims that Reeves does pursue on appeal, the circuit court found that Reeves had failed to prove these claims by a preponderance of the evidence. We agree.
The record from Reeves’s direct appeal indicates that attorneys Blanchard *747 McLeod and Marvin Wiggins were initially appointed to represent Reeves. McLeod withdrew approximately three months before trial, and Thomas Goggans was appointed as a replacement. Reeves was represented at trial by Goggans and Wiggins. Goggans continued to represent Reeves on appeal. At the Rule 32 eviden-tiary hearing, Reeves did not call McLeod, Goggans, or Wiggins to testify. In its order, the circuit court found that Reeves had failed to prove his claims of ineffective assistance of trial and appellate counsel, in part, because he had failed to call Goggans and Wiggins to testify at the evidentiary hearing. On appeal, Reeves argues that the circuit court erred in finding that his failure to call his attorneys to testify resulted in his failing to prove his ineffective-assistance-of-counsel claims because, he says, “there is no requirement that trial counsel testify.” (Reeves’s brief, p. 62.) Specifically, Reeves argues that because the Strickland test is an objective one, testimony from counsel is not necessary to prove any claim of ineffective assistance of counsel.
However, Reeves’s argument fails to take into account the requirement that courts indulge a strong presumption that counsel acted reasonably, a presumption that must be overcome by evidence to the contrary. In Broadnax v. State, 130 So.3d 1232 (Ala.Crim.App.2013), this Court stated:
“It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record. Indeed, ‘trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.’ Rylander v. State, 101 S.W.3d 107, 111 (Tex.Crim.App.2003). This is so because it is presumed that counsel acted reasonably:
“‘The presumption impacts on the burden of proof and continues throughout the case, not dropping out just because some conflicting evidence is introduced. “Counsel’s competence ... is presumed, and the [petitioner] must rebut this presumption by proving that his attorney’s representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.” Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (emphasis added) (citations omitted). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, “where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” Williams [v. Head,] 185 F.3d [1223,] 1228 [(11th Cir.1999)]; see also Waters [v. Thomas,] 46 F.3d [1506,] 1516 [(11th Cir.1995) ] (en banc) (noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).’
“Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000). “‘If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.” ’ Dunaway v. State, 198 So.3d 530, 547 (Ala.Crim.App.2009) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.App.2007)).”
130 So.3d at 1255-56.
Subsequently, in Stallworth v. State, 171 So.3d 53 (Ala.Crim.App.2013) *748 (opinion on return to remand), this Court explained:
“Further, the presumption that counsel performed effectively ‘“is like the ‘presumption of innocence’ in a criminal trial,” ’ and the petitioner bears the burden of disproving that presumption. Hunt v. State, 940 So.2d 1041, 1069 (Ala.Crim.App.2005) (quoting Chandler v. United States, 218 F.3d 1305, 1314, n. 15 (11th Cir.2000) (en banc)). ‘Never does the government acquire the burden to show competence, eyen when some evidence to the contrary might be offered by the petitioner.’ Jd. ‘ “ ‘An ambiguous or , silent record is, not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, “where the record is incomplete or unclear about [counsel]’s actions, [a court] will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ ” ’ Hunt, 940 So.2d at 1070-71 (quoting Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001), quoting in turn Chandler, 218 F.3d at 1314 n. 15, quoting, in turn Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)). Thus, to overcome the strong presumption of effectiveness, a Rule 32 petitioner must, at his evidentiary hearing, question trial counsel regarding his or her actions and reasoning. See, e.g., Broadnax v. State, 130 So.3d 1232, 1255-56 (Ala.Crim.App.2013) (recognizing that ‘[i]t is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the' claim is based on specific actions, or inactions, of counsel that occurred outside the record[, and holding that] circuit court correctly found that Broadnax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably*); Whitson v. State, 109 So.3d 665, 676 (Ala.Crim.App.2012) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question appellate counsel regarding their reasoning); Brooks v. State, 929 So.2d 491, 497 (Ala.Crim.App.2005) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question trial counsel regarding their reasoning); McGahee v. State, 885 So.2d 191, 221-22 (Ala.Crim.App.2003) (‘[C]ounsel. at the Rule 32 hearing did not ask trial counsel any questions about his reasons for not calling the' additional witnesses to testify. Because he has failed to present any evidence about counsel’s decisions, we view trial counsel’s actions as strategic decisions,.which are virtually unassailable.’); Williams v. Head, 185 F.3d at 1228; Adams v. Wainwright, 709 F.2d 1443, 1445-46 (11th Cir.1983) (‘[The petitioner] did not call trial counsel to testify ... [; therefore,] there is no basis in this record for finding that counsel did not sufficiently investigate [the petitioner’s] background.’); Callahan v. Campbell, 427 F.3d 897, 933 (11th Cir.2005) (‘Because [trial counsel] passed away before the Rule 32 hearing, we have no evidence of what he did to prepare for the penalty phase of [the petitioner’s] trial. In a situation like this, we will presume the attorney “did what he should have doné, and that he exercised reasonable professional judgment.” ’).”
171 So.3d at 92-93 (emphasis added). See also Clark v. State, 196 So.3d 285 (Ala.Crim.App.2015) (holding that Rule 32 petitioner had failed to prove that his appellate counsel was ineffective for not raising issues on appeal where the petitioner did not call his appellate counsel to testify at the *749 Rule 32 evidentiary hearing regarding counsel’s reasons for not raising those issues).
In this case, Reeves’s failure to call his attorneys to testify is fatal to his claims of ineffective assistance of counsel. Reeves reasserts on appeal the following claims of ineffective assistance of trial and appellate counsel that he raised in his petition:
(1) That his trial counsel were ineffective for not hiring Dr. Goff, or another neuropsychologist, to evaluate Reeves for intellectual disability and for not then presenting testimony from that expert during the penalty phase of the trial that Reeves was intellectually disabled in order to establish a mitigating circumstance;
(2) That his trial counsel were ineffective for relying during the penalty phase of his trial on the testimony of Dr. Ro-nan, the court-appointed psychologist who examined Reeves before trial to determine his competency to stand trial and his mental state at the time of the offense, to present mitigation evidence;
(3) That his trial counsel were ineffective for not objecting during the penalty phase of the trial to Dr. Ronan’s testimony on cross-examination that Reeves was not intellectually disabled;
(4) That his trial-counsel were ineffective for not conducting an adequate mitigation investigation and for not presenting what he claimed was substantial mitigation evidence during the penalty phase of the trial;
(5) That his trial counsel were ineffective for not' objecting at trial to
(a) the prosecutor’s allegedly urging the jury during closing arguments at the penalty phase of the trial to consider nonstatutory aggravating circumstances to impose a death sentence;
(b) the prosecutor’s introducing evidence and making argument during both the guilt and penalty phases of the trial that Reeves was involved in a gang;
(c) the prosecutor’s allegedly referring to the-jury’s penalty-phase verdict as a recommendation; and
(d) the trial court’s instructing the jury that its penalty-phase verdict was a recommendation; and
(6) That his appellate counsel was ineffective for not raising on appeal the following claims:
(a) that the prosecutor improperly urged the jury during closing arguments at the penalty phase of the trial to consider nonstatutory aggravating circumstances to impose a death sentence;
(b) that the prosecutor improperly introduced evidence and made, argument during both the guilt and penalty phases of the trial that Reeves was involved in a gang;
(c) that the prosecutor improperly referred -to the jury’s penalty-phase verdict as a recommendation; and
(d) that the trial court improperly instructed the jury that its penalty-phase verdict was a recommendation.[16]
*750 The decisions by counsel that Reeves challenges in claims (1), (2), (3), (5), and (6), as set out above—what experts to hire, what witnesses to call to testify, what mitigation evidence to present, what objections to make and what issues to raise at trial, and what issues to raise on appeal— are typically considered strategic decisions, and do not constitute per se deficient performance. See, e.g., Walker v. State, 194 So.3d 253 (Ala.Crim.App.2015) (“ ‘An attorney’s decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy.’ People v. Payne, 285 Mich.App. 181, 190, 774 N.W.2d 714, 722 (2009). ‘[I]n general, the “decision not to hire experts falls within the realm of trial strategy.”’ State v. Denz, 232 Ariz. 441, 445, 306 P.3d 98, 102 (2013), quoting Yohey v. Collins, 985 F.2d 222, 228 (5th Cir.1993).”); Johnson v. State, [Ms. CR-05-1805, September 28, 2007] — So.3d -, -(Ala.Crim.App.2007) (“ ‘[I]n the context of an ineffective assistance claim, “a decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess.’” Curtis v. State, 905 N.E.2d 410, 415 (Ind.Ct.App.2009). ‘[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.’ Boyle v. McKune, 544 F.3d 1132, 1139 (10th Cir.2008).”); Dunaway v. State, 198 So.3d 530, 547 (Ala.Crim.App.2009) (“ ‘The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.’ Hill v. Mitchell, 400 F.3d 308, 331 (6th Cir.2005).”), rev’d on other grounds, 198 So.3d 567 (Ala.2014); Lane v. State, 708 So.2d 206, 209 (Ala.Crim.App.1997) (“This court has held that ‘[o]bjections are a matter of trial strategy, and an appellant must overcome the presumption that “conduct falls within the wide range of reasonable professional assistance,” that is, the presumption that the challenged action “might be considered sound trial strategy.” ’ Moore v. State, 659 So.2d 205, 209 (Ala.Cr.App.1994).”); and Thomas v. State, 766 So.2d 860, 876 (Ala.Crim.App.1998) (“[Ajppellate counsel has no constitutional obligation to raise every nonfrivolous issue .... Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal.”), aff'd, 766 So.2d 975 (Ala.2000), overruled on other grounds, Ex parte Taylor, 10 So.3d 1075 (Ala.2005).
The burden was on Reeves to prove by a preponderance of the evidence that his *751 counsel’s challenged decisions were not the result of reasonable strategy, i.e., the burden was on Reeves to present evidence overcoming the strong presumption that counsel acted reasonably. However, because Reeves failed to call his counsel to testify, the record is silent as to the reasons trial counsel (1) chose not to hire Dr. Goff or another neuropsychologist to evaluate Reeves for intellectual disability and chose not to present testimony from such an expert during the penalty phase of the trial that Reeves was intellectually disabled in order to establish a mitigating circumstance; (2) chose to rely during the penalty phase of the trial on the testimony of Dr. Ronan to present mitigation evidence; (3) chose not to object to Dr. Ro-nan’s testimony on cross-examination during the penalty phase of the trial that Reeves was not intellectually disabled; and (4) chose not to object at trial to the prosecutor’s allegedly urging the jury during closing arguments at the penalty phase of the trial to consider nonstatutory aggravating circumstances to impose a death sentence, to the prosecutor’s introducing evidence and making argument during both the guilt and penalty phases of the trial that Reeves was involved in a gang, to the prosecutor’s allegedly referring to the jury’s penalty-phase verdict as a recommendation, and to the trial court’s instructing the jury that its penalty-phase verdict was a recommendation. The record is also silent as to the reasons appellate counsel chose not to raise on appeal the claims that the prosecutor improperly urged the jury during closing arguments at the penalty phase of the trial to consider nonstatutory aggravating circumstances to impose a death sentence, that the prosecutor improperly introduced evidence and argued during both the guilt and penalty phases of the trial that Reeves was involved in a gang, that the prosecutor improperly referred to the jury’s penalty-phase verdict as a recommendation, and that the trial court improperly instructed the jury that its penalty-phase verdict was a recommendation. Where “ ‘ “the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.”’” Broadnax, 130 So.3d at 1256 (citations omitted).
As for Reeves’s i claim that his trial counsel were ineffective for not conducting an adequate mitigation investigation and for not presenting what he claimed was substantial mitigation evidence during the penalty phase of the trial, claim (4), as set out above, we point out that Reeves’s claim in this regard is not that counsel failed to conduct any mitigation investigation or that counsel failed to present any rhitigation evidence during the penalty phase of the trial.' Rather, Reeves’s.claim is that counsel did not conduct an adequate investigation and either did not present during the penalty phase of the trial all mitigating evidence that may have been available or did not present the mitigating evidence in the manner he believes would have been most appropriate.
“[T]rial counsel’s failure to investigate the possibility of mitigating evidence [at all] is, per se, deficient performance.” Ex parte Land, 775 So.2d 847, 853 (Ala.2000), overruled on other grounds, State v. Martin, 69 So.3d 94 (Ala.2011). However, “counsel is not necessarily ineffective simply because he does not present all possible mitigating evidence.” Pierce v. State, 851 So.2d 558, 578 (Ala.Crim.App.1999), rev’d on other grounds, 851 So.2d 606 (Ala.2000). When the record reflects that counsel presented mitigating evidence during the penalty phase of the trial, as here, the. question becomes whether counsel’s mitigation investigation and counsel’s deci-. *752 sions regarding the presentation of mitigating evidence were reasonable.
“ ‘[B]efore we can assess the reasonableness of counsel’s investigatory efforts, we must first determine the nature and extent of the investigation that took place. ...’ Lewis v. Horn, 581 F.3d 92, 115 (3d Cir.2009). Thus, ‘[although [the] claim is that his. trial; coünsel should have done something more, we [must] first look at what the lawyer did in fact.’ Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000),”
Broadnax, 130 So.3d at 1248 (emphasis added).
At the evidentiary hearing, Reeves presented testimony from Karen Salekin, a forensic clinical psychologist who performed a mitigation investigation, regarding the mitigation evidence he believes his counsel should have presented and the manner in which he believes that evidence should have been presented. However, Reeves presented no evidence at the evi-dentiary hearing regarding what mitigation investigation his trial counsel conducted, because Reeves failed- to call trial counsel to testify. Although Reeves argues that counsel’s investigation was not adequate, because the record is silent as to the extent of counsel’s actual investigation, we must presume that counsel exercised reasonable professional judgment in conducting the investigation and that counsel’s decisions resulting from their investigation were also reasonable. The silent record before this Court regarding counsel’s investigation and their resulting decisions as to what evidence to present during the penalty phase of the trial and how to present that evidence is not sufficient to overcome the strong presumption of effective assistance. See, e.g., Woods v. State, 13 So.3d 1, 37 (Ala.Crim.App.2007) (holding, on appeal from four capital-murder convictions and a sentence of death, that the appellant had failed to establish that his counsel’s mitigation investigation constituted deficient performance where the record contained “no evidence about the scope of counsel’s'mitigation-investigation” but contained indications that counsel had at least conducted some mitigation investigation).[17]
For the reasons set forth above, Reeves failed to satisfy his burden of proof as to his claims of ineffective assistance of counsel. Therefore, the circuit court properly denied those claims.
IV.
Reeves next contends that the circuit court erred in ’ summarily dismissing his claims of juror misconduct without allowing him to présent evidence to support them.
In his petition, Reeves alleged that during his trial one of the jurors who sat on his jury improperly communicated with her husband about the trial and improperly watched and read media, coverage of the trial. Reeves further alleged that, during the penalty-phase deliberations, after the jury had entered an informal vote of nine in favor of the death penalty and three in favor of life imprisonment without the possibility of parole, that same juror escorted another juror—a juror who Reeves claimed was young and emotional and had originally voted for life imprisonment without the possibility of parole—out of the jury deliberation room and spoke to that juror in private. When the two jurors returned, Reeves alleged, the young and *753 emotional juror changed her vote and voted for the death penalty, resulting in a jury verdict of 10 in favor of the death penalty and 2 in favor of life imprisonment without the possibility of parole. Finally, Reeves alleged that this same juror repeatedly told the other members of the jury that Reeves’s family “would ‘come after’ the jurors after - the trial” and stressed to the other jurors that “the decision to impose the death penalty truly belonged to the judge rather than the jury.” (C. 585.). In support of these claims, Reeves attached to his petition an affidavit from another juror who sat on Reeves’s jury, juror G.B., in which G.B. averred essentially the same facts as Reeves alleged in his petition.
At the conclusion of the Rule 32 eviden-tiary hearing, the following exchange occurred:
“[Reeves’s counsel]: ... Judge, there was one other thing. I think when you ruled on the issue of juror misconduct, you indicated that we could put on the record— • .
“THE COURT: I did, and it slipped my mind.
“[Reeves’s counsel]: And [cocounsel] is going to go ahead and do that.”
(R. 285-86.) Reeves’s counsel then made an offer of proof regarding, the evidence that would be presented regarding the juror-misconduct claims if the court had allowed such evidence.
Although the record contains no order by the circuit court summarily dismissing Reeves’s juror-misconduct claims before the evidentiary hearing, the above exchange indicates that the court had ruled on the claims before the hearing, apparently concluding that the claims did not warrant an evidentiary hearing. In its final order denying Reeves’s petition, the court found that Reeves’s juror-misconduct claims were precluded by Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., because they could have been, but were not, raised and addressed at trial and on appeal. Therefore, we consider Reeves’s juror-misconduct claims as having been summarily dismissed without Reeves’s being afforded an opportunity to present evidence to support those claims.
We agree with Reeves’s argument on appeal that the. circuit court erred in finding that his juror-misconduct claims were precluded by Rules 32.2(a)(3) and (a)(5) on the ground that they could have been, but were not,, raised and addressed at trial and on appeal. See, e.g., Ex parte Hodges, 147 So.3d 973 (Ala.2011); Ex parte Harrison, 61 So.3d 986 (Ala.2010); Ex parte Burgess, 21 So.3d 746 (Ala.2008). However, the circuit court’s error in this regard does not require a remand for further proceedings in this case because we conclude that Reeves’s juror-misconduct claims were not sufficiently pleaded to warrant an evidentiary hearing and, therefore, that the circuit court properly refused to allow Reeves to present evidence on this claim at the Rule 32 hearing.
Rule 32.3, Ala. R.Crim. P., states that “[t]he petitioner shall have the burden of pleading and proving by a preponderance-of the evidence the facts necessary to entitle the petitioner to relief.” Rule 32.6(b), Ala. R.Crim. P., states that “[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.” To sufficiently plead a claim.of juror-misconduct, a Rule 32 petitioner must, at a minimum, identify the juror who the petitioner believes committed the misconduct, must allege specific *754 facts indicating what actions that juror took that the petitioner believes constituted misconduct, and must allege specific facts indicating how that juror’s actions denied the petitioner a fair trial. See, e.g., Moody v. State, 95 So.3d 827, 859 (Ala.Crim.App.2011) (holding that Rule 32 petitioner had failed to satisfy his burden of pleading his claim of juror misconduct when the petitioner “failed to identify a single juror who he believed did not answer questions truthfully during voir dire,” failed to “identify which questions he believe[d] the jurors did not answer truthfully,” and “failed to plead what ‘extraneous’ information he believes was considered during the jury’s deliberations or how that information prejudiced him.”).
In this case, Reeves failed to identify in his petition the juror he believed committed the misconduct; he referred to the juror only as “Juror Jane Doe.” (C. 584-85.) He also failed to identify the juror who allegedly changed her vote during the penalty-phase deliberations after allegedly speaking with Juror Jane Doe privately. G.B.’s affidavit[18] also failed to identify Juror Jane Doe or the juror who allegedly changed her vote during the penalty-phase deliberations. In a footnote in his petition, Reeves admitted that he knew the identity of both jurors; he alleged that “[significant efforts have been undertaken to identify Juror Jane Doe” and that “by speaking with certain jurors who served on Mr. Reeves’s trial and have been willing to speak with Mr. Reeves’s current counsel, the identities of these jurors are believed to be known.” (C. 585.) Nonetheless, Reeves failed to identify either juror in his petition. In addition, although Reeves alleged that Juror Jane Doe had spoken to her husband about the case and had watched and read media reports about the case, Reeves failed to identify exactly what information Juror Jane Doe received from her husband or from the media reports or how this unidentified information prejudiced him.
Because Reeves failed to identify in his petition Juror Jane Doe, the juror he believed was improperly influenced during the penalty phase of the tidal, or the specific “extraneous” information he believed Juror Jane Doe improperly considered, all of Reeves’s juror-misconduct claims were insufficient to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b). Moreover, Reeves’s claim that Juror Jane Doe repeatedly told the other members of the jury that Reeves’s family “would ‘come after’ the jurors after the trial” and stressed to the other jurors that “the decision to impose the death penalty truly belonged to the judge rather than the jury” also fails to state a material issue of fact or law upon which relief could be granted. (C. 585.) Reeves’s claim in this regard is based on the debates and discussions of the jury, not on extraneous facts considered by it.[19] As this Court explained in Bryant v. State, 181 So.3d 1087 (Ala.Crim.App.2011):
“It is well settled that ‘matters that the jurors bring up in their deliberations are simply not improper under Alabama law, *755 because the law protects debates and discussions of jurors and statements they make while deliberating their decision.’ Sharrief v. Gerlach, 798 So.2d 646, 653 (Ala.2001). ‘Rule 606(b), Ala. R. Evid., recognizes the important “distinction, under Alabama law, between ‘extraneous facts,’ the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the ‘debates and discussions of the jury,’ which are protected from inquiry.” ’ Jackson v. State, 133 So.3d 420, 431 (Ala.Crim.App.2009) (quoting Sharrief, supra at 652). ‘[T]he debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts.’ Sharrief, 798 So.2d at 653. Thus, ‘affidavit[s or testimony] showing that extraneous facts influenced the jury’s deliberations [are] admissible; however, affidavits concerning “the debates and discussions of the case by the jury while deliberating thereon” do not fall within this exception.’ CSX Transp., Inc. v. Dansby, 659 So.2d 35, 41 (Ala.1995) (quoting Alabama Power Co. v. Turner, 575 So.2d 551, 557 (Ala.1991)).”
181 So.3d at 1126-27. To allow “consideration of this claim of juror misconduct— which is based entirely on the debate and deliberations of the jury—Vould destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny.’ ” Bryant, 181 So.3d at 1128 (quoting Jones v. State, 753 So.2d 1174, 1204 (Ala.Crim.App.1999)).
For these reasons, the circuit court properly dismissed Reeves’s claims of juror misconduct without affording Reeves an opportunity to present evidence.[20]
V.
Finally, Reeves contends that the circuit court erred in denying, on procedural grounds, the claim in his petition that lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.
We agree with Reeves that the circuit court erred in finding his constitutional challenge to lethal injection to be precluded by Rules 32.2(a)(3) and (a)(5). Although typically such a constitutional challenge to a sentence would be subject to the preclusions in Rule 32.2(a)(3) and (a)(5), in this case Reeves was convicted and sentenced in 1998 and his convictions and sentences were affirmed on appeal in 2000, years before Alabama adopted lethal injection as its primary method of execution. See Act No. 2002-492, Ala. Acts 2002. At the time Reeves was convicted and sentenced to death and during his direct appeal, Alabama’s method of execution was electrocution. It is' well settled “that trial counsel cannot be held to be ineffective for failing to forecast changes in the law.” Dobyne v. State, 805 So.2d 733, 748 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001). Because Reeves’s trial and appellate counsel could not have been expected to forecast Alabama’s change in its method of execution, Reeves could not have challenged the constitutionality of lethal injection at trial and on appeal. Therefore, the circuit court erred in find *756 ing this claim to be precluded by Rules 32.2(a)(3)-and (a)(5). -
However, the circuit court’s error in this regard does not require this cause to be remanded for further proceedings. First, it is not clear from Reeves’s petition whether Reeves challenged in his petition the constitutionality of lethal injection per se or the constitutionality of Alabama’s specific lethal-injection drug protocol. Because we cannot determine from the" allegations in his petition exactly which claim Reeves asserted, his claim in this regard necessarily fails to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b).
Moreover, to the extent- that Reeves is challenging the constitutionality of lethal injection per se, that claim has been expressly rejected by this Court numerous 'times. See, e.g., Townes v. State, [Ms. CR-10-1892, December 18, 2015] — So.3d -, -(Ala.Crim.App.2015), and the cases cited therein. To the extent that Reeves is challenging Alabama’s specific drug protocol for lethal injection, the drug protocol Reeves mentioned in his petition—sodium thiopental, pancuronium bromide, and potassium chloride—is no longer the drug protocol Alabama uses for lethal injection. Therefore, Reeves’s challenge in. his petition to that drug protocol, is moot. Additionally, it appears that in his brief on appeal Reeves is attempting to challenge Alabama’s current drug protocol for lethal injection, specifically Alabama’s use of midazolam as a substitute for sodium thiopental. That challenge, however, was not raised in Reeves’s petition and is, therefore, not properly before this Court for review. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997) (“An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.”). In any event, the United States Supreme Court has upheld as constitutional the use of midazolam for lethal injection. See Glossip v. Gross, 576 U.S. -, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015). Therefore, Reeves is due no relief on this claim.[21]
VI.
For the foregoing reasons, the judgment of the circuit court denying Reeves’s. Rule 32 petition is due to, be affirmed.
In affirming the circuit court’s judgment, we recognize that the United States Supreme Court , recently vacated this Court’s judgment in Johnson v. State, [Ms. CR-10-1606, May 20, 2014] - So.3d - (Ala.Crim.App.2014), a case in which the death penalty had been imposed, and remanded the cause for further consideration in light of its opinion in Hurst v. Florida, 577 U.S. -, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). See Johnson v. Alabama, 578 U.S. —, 136 S.Ct. 1837, 194 L.Ed.2d 828 (2016). In Hurst, the United States Supreme Court held unconstitutional Florida’s capital-sentencing scheme on the ground that it violated its holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because Florida’s statute authorized a sentence of death based on a finding by the trial judge, rather than by the jury, that an aggravating circumstance existed. The impact, if any, of Hurst -on Alabama’s capital-sentencing scheme has not yet been addressed by this Court .or by the Alabama Supreme Court, We need not address it here because Hurst is not applicable in this case.
*757 The United States Supreme Court’s opinion in Hurst was based solely on its previous opinion in Ring, an opinion the United States Supreme Court held did not apply retroactively on collateral review to cases that were already final when the decision was announced. See Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Because Ring does not apply retroactively on collateral review, it follows that Hurst also does not apply retroactively on collateral review. Rather, Hurst applies only to cases not yet final when that opinion was released, such as Johnson, supra, a case that was still on direct appeal (specifically, pending certio-rari review in the United States Supreme Court) when Hurst was released. Reeves’s case, however, was final in 2001, 15 years before the opinion in Hurst was released. Therefore, Hurst is not applicable here.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. This Court may take judicial notice of its own records, and we do so in this case. See Nettles v. State, 731 So.2d 626, 629 (Ala.Crim.App.1998), and Hull v. State, 607 So.2d 369, 371 n. 1 (Ala.Crim.App.1992).

. Rule 32.2(c), Ala. R.Crim. P., was amended effective August 1, 2002, to reduce the limitations period from two years to one year. However, in cases in which the certificate of judgment was issued before July 31, 2001, as here, the two-year limitations period applies. See Ex parte Gardner, 898 So.2d 690, 691 (Ala.2004).

. All references in this opinion to the petition shall be considered references to the second amended petition filed on August 31, 2006.

.In Atkins, the United States Supreme Court used the term "mental retardation.” However, more recently in Hall v. Florida, 572 U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), the United States Supreme Court recognized that psychiatrists and other experts had stopped using the term "mental retardation” and had begun using the term "intellectual disability,” and the Court used the terms "intellectual disability” and "intellectually disabled” throughout its opinion in Hall and again in its subsequent opinion in Brumfield v. Cain, 576 U.S. -, 135 S.Ct. 2269, 192 L.Ed.2d 356 (2015). This Court followed that trend in Lane v. State, [Ms. CR-10-1343, April 29, 2016] — So.3d -(Ala.Crim.App.2016) (opinion after remand by the United States Supreme Court), and we do so in this opinion.

. In fact, in this case, unlike Ex parte Ingram, the circuit judge who ruled on the' petition was the same judge who had presided over Reeves’s trial.

. In 2007, the American Association on Mental Retardation changed its name to the American Association on Intellectual and Developmental Disabilities.

. In a two-sentence passing argument in its brief on appeal, the State asserts that Hall, decided in 2014, does not apply retroactively to cases on collateral review. In support of its position, the State relies on In re Henry, 757 F.3d 1151, 1158 (11th Cir.2014), in which the United States Court of Appeals for the Eleventh Circuit held that Hall "announce[d] a new rule of constitutional law,” but held that the new rule does not apply retroactively on collateral review for purposes of 28 U.S.C. § 2244(b). We disagree with the Eleventh Circuit’s characterization of Hall as a new rule of constitutional law. We view Hall, not as a new rulé of constitutional law, but simply as an application of existing law, i.e., Atkins, to a specific set of facts.

. Although in Hall the United States Supreme Court cited Alabama as a state that "also may use a strict IQ score cutoff at 70," 572 U.S. at -, 134 S.Ct. at 1996 (emphasis added), it did so based on a single comment by this Court in Smith v. State, 71 So.3d 12, 20 (Ala.Crim.App.2008), that the Alabama Supreme Court’s definition of intellectual disability did not include consideration of the . SEM. However, this Court held in Smith that the petitioner had failed to plead his claim of intellectual disability, and our statement that consideration of the SEM was precluded was entirely dicta. In any event, this Court recently recognized in Lane v. State, [Ms. CR-10-1343, April 29, 2016] - So.3d - (Ala.Crim.App.2016) (opinion after remand by the United States Supreme Court), that this Court’s statement in Smith was not supported by the Alabama Supreme Court’s post-Atkins opinions and was erroneous, and we overruled Smith ”[t]o the extent that Smith .:. precludes a trial court from considering a margin of error or SEM when evaluating a defendant’s IQ test score for purposes of an Atkins claim.” — So.3d at —.

. We note that, in his written report, Dr. Goff stated that Reeves’s full-scale IQ score of 71 placed him "within the borderline range of psychometric intelligence." (C. 699.)

. In contrast, in his written report, Dr. Goff stated that Seroy "was not present for the most part during [Reeves's] formative years” and "[i]t was, therefore, necessary to obtain a substantial amount of information from [Reeves] and from the records in regard to the history.” (C. 697.) ■

. No evidence was presented that Reeves, in fact, earned his GED.

. Dr. King said that he did not administer the tactile-form-recognition test.

. The circuit court issued the order in 2009, years before this Court first addressed the "Flynn Effect."

. Reeves also maintains in passing that consideration of the SEM makes his IQ scores "even lower” than reported. (Reeves’s brief, p. 44.) However, contrary to Reeves’s belief, consideration of the SEM would not make his IQ scores "even lower.” In Byrd v. State, 78 So.3d 445, 452 (Ala.Crim.App.2009), this Court "rejected the appellant’s] request that we presume that a capital defendant's IQ falls at the bottom of the range of the confidence interval or ‘margin of error.’ ” See also Carroll v. State, 215 So.3d 1135, 1152 (Ala.Crim.App.2015). Although Byrd was released long before the United States Supreme Court’s opinion in Hall, nothing in Hall requires a court to presume that a person’s IQ score falls in the bottom of the SEM of plus or minus five points. As noted above, in Hall, the Supreme Court merely recognized that the SEM is a fact that means an IQ score is not determinative of intellectual functioning and must be considered, not as a fixed number, but as a range. See Ledford v. Warden, Georgia Diagnostic & Classification Prison, 818 F.3d 600, 641 (11th Cir.2016) ("[T]he standard error of measurement is a bi-directional concept that does not carry with it a presumption that an individual’s IQ falls to the bottom of his IQ range.”).

. Because we find no error in the circuit court’s findings regarding the first two prongs of intellectual disability, we need not examine the third prong—whether the deficits manifested before the age of 18.

. We note that Reeves also reasserts on appeal the claim from his petition that his trial counsel were ineffective for allegedly not investigating the possibility that Reeves was not the shooter. However, Reeves mentions this claim only in passing in a single sentence in his brief, and he makes no argument at all in his brief regarding why he believes the circuit court's denial of this claim was error. Reeves’s argument regarding this ineffective-assistance-of-counsel claim fails to comply with Rule 28(a)(10), Ala. R.App. P., and it is well settled that the "[failure to comply with Rule 28(a)(10) has- been deemed a waiver of *750 the issue presented.” C.B.D. v. State, 90 So.3d 227, 239 (Ala.Crim.App.2011). Therefore, Reeves’s claim that his trial counsel was ineffective for allegedly not investigating the possibility that Reeves was not the shooter is deemed waived and will not be considered by this Court. Additionally, we note that Reeves also argues in his brief on appeal that his trial and appellate counsel were ineffective for not challenging at trial and on appeal the constitutionality of Alabama’s capital-sentencing scheme. Although Reeves raised a claim in his petition that Alabama’s capital-sentencing scheme was unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), nowhere in his petition did Reeves assert that his trial or appellate counsel were ineffective for not raising a challenge to the constitutionality of Alabama’s capital-sentencing scheme at trial or on appeal. A substantive challenge to the constitutionality of a statute is not the same as a claim of ineffective assistance of counsel. Therefore, because Reeves did not raise in his petition claims that his trial and appellate counsel were ineffective for not challenging the constitutionality of Alabama’s capital-sentencing scheme, those claims are not properly before this Court for review and will not be considered. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.”).

. Although Woods was in a different procedural posture than this case—it was a direct appeal from-multiple convictions and a death sentence—the principle that a record that is silent regarding the scope of counsel’s mitigation investigation will not support a finding that counsel's performance is deficient is equally applicable here.

. "Although a Rule 32 petitioner is not required to include attachments to his or her petition in order to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), when a petitioner does so, those attachments are considered part of the pleadings.” Conner v. State, 955 So.2d 473, 476 (Ala.Crim.App.2006). See also Ex parte Lucas, 865 So.2d 418 (Ala.2002) (attachments to a Rule 32 petition are considered part of the pleadings).

. Reeves did not allege in his petition that Juror Jane Doe’s statement to the jury that Reeves's family would "come after” the jurors after trial was based on extraneous information she had received.

. Although the lack of specificity and the failure to state a material issue of fact or law upon which relief could be granted were not the reasons for the circuit court’s denial of these claims, we may nonetheless affirm the circuit court’s judgment on this ground. See Moody v. State, 95 So.3d 827, 833-34 (Ala.Crim.App.2011), and McNabb v. State, 991 So.2d 313, 333 (Ala.Crim.App.2007), and the cases cited therein.

. Although these were not the reasons the circuit court denied this claim, we may nonetheless affirm the-circuit- court’s judgment on these grounds. See Moody v. State, 95 So.3d 827, 833-34 (Ala.Crim.App.2011), and McNabb v, State, 991 So.2d 313, 333 (Ala.Crim.App.2007), and the cases cited therein.